WEINBERGER, SECRETARY OF HEALTH, EDU-
CATION, AND WELFARE, ET AL. *v.* SALFI ET AL.

No. 74–214.  Argued March 19, 1975—Decided June 26, 1975

750

*Harriet S. Shapiro* argued the cause for appellants. On the brief were *Solicitor General Bork, Assistant Attorney General Hills, William L. Patton,* and *William Kanter.*

*Don B. Kates, Jr.,* argued the cause for appellees. With him on the brief were *Bruce N. Berwald* and *John Gant.*\*

MR. JUSTICE REHNQUIST delivered the opinion of the Court.

Appellants, the Department of Health, Education, and Welfare, its Secretary, the Social Security Administration and various of its officials, appeal from a decision of the United States District Court for the Northern District of California invalidating duration-of-relationship

---

\*Briefs of *amici curiae* urging affirmance were filed by *Ralph Santiago Abascal, Philip Goar,* and *Sanford Jay Rosen* for the San Francisco Neighborhood Legal Assistance Foundation, Inc., et al., and by *Christopher H. Clancy* and *Jonathan A. Weiss* for Legal Services for the Elderly Poor.

Social Security eligibility requirements for surviving wives and stepchildren of deceased wage earners. 373 F. Supp. 961 (1974).

That court concluded that it had jurisdiction of the action by virtue of 28 U. S. C. § 1331, and eventually certified the case as a class action. On the merits, it concluded that the nine-month requirements of §§ 216 (c)(5) and (e)(2) of the Social Security Act, 49 Stat. 620, as added, 64 Stat. 510, and as amended, 42 U. S. C. §§ 416 (c)(5) and (e)(2) (1970 ed. and Supp. III), constituted "irrebuttable presumptions" which were constitutionally invalid under the authority of *Cleveland Board of Education* v. *LaFleur,* 414 U. S. 632 (1974); *Vlandis* v. *Kline,* 412 U. S. 441 (1973); and *Stanley* v. *Illinois,* 405 U. S. 645 (1972). We hold that the District Court did not have jurisdiction of this action under 28 U. S. C. § 1331, and that while it had jurisdiction of the claims of the named appellees under the provisions of 42 U. S. C. § 405 (g), it had no jurisdiction over the claims asserted on behalf of unnamed class members. We further decide that the District Court was wrong on the merits of the constitutional question tendered by the named appellees.

I

Appellee Salfi married the deceased wage earner, Londo L. Salfi, on May 27, 1972. Despite his alleged apparent good health at the time of the marriage, he suffered a heart attack less than a month later, and died on November 21, 1972, less than six months after the marriage. Appellee Salfi filed applications for mother's insurance benefits for herself and child's insurance benefits for her daughter by a previous marriage, appellee Doreen Kalnins.[1] These applications were denied by the So-

---

[1] Title 42 U. S. C. § 402 (g)(1) (1970 ed. and Supp. III) provides for benefits for the "widow" of an insured wage earner, regardless of

cial Security Administration, both initially and on reconsideration at the regional level, solely on the basis of the duration-of-relationship requirements of §§ 416 (c)(5) and (e)(2), which define "widow" and "child." The definitions exclude surviving wives and stepchildren who had their respective relationships to a deceased wage earner for less than nine months prior to his death.[2]

---

her age, if she has in her care a "child" of such wage earner who is entitled to child's insurance benefits. Title 42 U. S. C. § 402 (d) (1970 ed. and Supp. III) provides for benefits for the "child" of a deceased insured wage earner who was dependent upon him at his death.

[2] Title 42 U. S. C. § 416 (c) (1970 ed., Supp. IV) provides in full:

"(c) The term 'widow' (except when used in section 402 (i) of this title) means the surviving wife of an individual, but only if (1) she is the mother of his son or daughter, (2) she legally adopted his son or daughter while she was married to him and while such son or daughter was under the age of eighteen, (3) he legally adopted her son or daughter while she was married to him and while such son or daughter was under the age of eighteen, (4) she was married to him at the time both of them legally adopted a child under the age of eighteen, (5) she was married to him for a period of not less than nine months immediately prior to the day on which he died, or (6) in the month prior to the month of her marriage to him (A) she was entitled to, or on application therefor and attainment of age 62 in such prior month would have been entitled to, benefits under subsection (b), (e), or (h) of section 402 of this title, (B) she had attained age eighteen and was entitled to, or on application therefor would have been entitled to, benefits under subsection (d) of such section (subject, however, to section 402 (s) of this title), or (C) she was entitled to, or upon application therefor and attainment of the required age (if any) would have been entitled to, a widow's, child's (after attainment of age 18), or parent's insurance annuity under section 231a of Title 45."

It is undisputed that appellee Salfi cannot qualify as a "widow" by satisfying condition (1), (2), (3), (4), or (6).

Title 42 U. S. C. § 416 (e) (1970 ed., Supp. III) provides in part: "(e) Child.

"The term 'child' means (1) the child or legally adopted child of an individual, (2) a stepchild who has been such stepchild for

The named appellees then filed this action, principally relying on 28 U. S. C. § 1331 for jurisdiction. They sought to represent the class of "all widows and stepchildren of deceased wage earners who are denied widow's [*sic*] or children's insurance benefits because the wage earner died within nine months of his marriage to the applicant or (in case of a stepchild) the applicant's mother." App. 8. They alleged at least partial exhaustion of remedies with regard to their personal claims, but made no similar allegations with regard to other class members. They sought declaratory relief against the challenged statute, and injunctive relief restraining appellants from denying mother's and child's benefits on the basis of the statute. In addition to attorneys' fees and costs, they also sought "damages or sums due and owing equivalent to the amount of benefits to which plaintiffs became entitled as of the date of said entitlement." *Id.*, at 13.

A three-judge District Court heard the case on cross-motions for summary judgment, and granted substantially all of the relief prayed for by appellees. The District Court rendered a declaratory judgment holding the challenged statute to be unconstitutional, certified a class consisting of "all otherwise eligible surviving spouses and stepchildren . . . heretofore disqualified from receipt of . . . benefits by operation" of the duration-of-relationship requirements, enjoined appellants from denying benefits on the basis of those requirements, and ordered them to provide such benefits "from the time of

---

not less than one year immediately preceding the day on which application for child's insurance benefits is filed or (if the insured individual is deceased) not less than nine months immediately preceding the day on which such individual died . . . ."

Prior to 1967, the required duration of relationship was a full year. The reduction to nine months was accomplished in Pub. L. 90–248, §§ 156 (a) and (b), 81 Stat. 866.

original entitlement." 373 F. Supp., at 966. We noted probable jurisdiction of the appeal from that judgment. 419 U. S. 992 (1974).

In addition to their basic contention that the duration-of-relationship requirements pass constitutional muster, appellants present several contentions bearing on the scope of the monetary relief awarded by the District Court. They contend that the award is barred by sovereign immunity insofar as it consists of retroactive benefits, that regardless of sovereign immunity invalidation of the duration-of-relationship requirements should be given prospective effect only, and that the District Court did not properly handle certain class-action issues. Because we conclude that the duration-of-relationship requirements are constitutional, we have no occasion to reach the retroactivity and class-action issues. We are confronted, however, by a serious question as to whether the District Court had jurisdiction over this suit.

## II

The third sentence of 42 U. S. C. § 405 (h) provides in part:

> "No action against the United States, the Secretary, or any officer or employee thereof shall be brought under [§ 1331 *et seq.*] of Title 28 to recover on any claim arising under [Title II of the Social Security Act]." [3]

On its face, this provision bars district court federal-question jurisdiction over suits, such as this one, which

---

[3] The literal wording of this section bars actions under 28 U. S. C. § 41. At the time § 405 (h) was enacted, and prior to the 1948 recodification of Title 28, § 41 contained all of that title's grants of jurisdiction to United States district courts, save for several special-purpose jurisdictional grants of no relevance to the constitutionality of Social Security statutes.

seek to recover Social Security benefits. Yet it was § 1331 jurisdiction which appellees successfully invoked in the District Court. That court considered this provision, but concluded that it was inapplicable because it amounted to no more than a codification of the doctrine of exhaustion of administrative remedies. The District Court's reading of § 405 (h) was, we think, entirely too narrow.

That the third sentence of § 405 (h) is more than a codified requirement of administrative exhaustion is plain from its own language, which is sweeping and direct and which states that *no* action shall be brought under § 1331, not merely that only those actions shall be brought in which administrative remedies have been exhausted. Moreover, if the third sentence is construed to be nothing more than a requirement of administrative exhaustion, it would be superfluous. This is because the first two sentences of § 405 (h), which appear in the margin,[4] assure that administrative exhaustion will be required. Specifically, they prevent review of decisions of the Secretary save as provided in the Act, which provision is made in § 405 (g).[5] The latter section pre-

---

[4] Title 42 U. S. C. § 405 (h) provides in full:

"Finality of Secretary's decision.

"The findings and decisions of the Secretary after a hearing shall be binding upon all individuals who were parties to such hearing. No findings of fact or decision of the Secretary shall be reviewed by any person, tribunal, or governmental agency except as herein provided. No action against the United States, the Secretary, or any officer or employee thereof shall be brought under section 41 of Title 28 to recover on any claim arising under this subchapter."

[5] Title 42 U. S. C. § 405 (g) provides:

"Judicial review.

"Any individual, after any final decision of the Secretary made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of

scribes typical requirements for review of matters before an administrative agency, including administrative exhaustion.[6] Thus the District Court's treatment of the

such decision or within such further time as the Secretary may allow. Such action shall be brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business, or, if he does not reside or have his principal place of business within any such judicial district, in the United States District Court for the District of Columbia. As part of his answer the Secretary shall file a certified copy of the transcript of the record including the evidence upon which the findings and decision complained of are based. The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing. The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive, and where a claim has been denied by the Secretary or a decision is rendered under subsection (b) of this section which is adverse to an individual who was a party to the hearing before the Secretary, because of failure of the claimant or such individual to submit proof in conformity with any regulation prescribed under subsection (a) of this section, the court shall review only the question of conformity with such regulations and the validity of such regulations. The court shall, on motion of the Secretary made before he files his answer, remand the case to the Secretary for further action by the Secretary, and may, at any time, on good cause shown, order additional evidence to be taken before the Secretary, and the Secretary shall, after the case is remanded, and after hearing such additional evidence if so ordered, modify or affirm his findings of fact or its decision, or both, and shall file with the court any such additional and modified findings of fact and decision, and a transcript of the additional record and testimony upon which his action in modifying or affirming was based. Such additional or modified findings of fact and decision shall be reviewable only to the extent provided for review of the original findings of fact and decision. The judgment of the court shall be final except that it shall be subject to review in the same manner as a judgment in other civil actions. Any action instituted in accordance with this subsection shall survive not-

third sentence of § 405 (h) not only ignored that sentence's plain language, but also relegated it to a function which is already performed by other statutory provisions.

withstanding any change in the person occupying the office of Secretary or any vacancy in such office."

[6] Nor can it be argued that the third sentence of § 405 (h) simply serves to prevent a bypass of· the § 405 (g) requirements by filing a district court complaint alleging entitlement prior to applying for benefits through administrative channels. The entitlement sections of the Act specify the filing of an application as a prerequisite to entitlement, so a court could not in any event award benefits absent an application. See 42 U. S. C. §§ 402 (a)–(h) (1970 ed. and Supp. III). See also § 402 (j)(1). Once the application is filed, it is either approved, in which event any suit for benefits would be mooted, or it is denied. Even if the denial is nonfinal, it is still a "decision of the Secretary" which, by virtue of the second sentence of § 405 (h), may not be reviewed save pursuant to § 405 (g).

Our Brother BRENNAN relies heavily, *post*, at 790–792, on a passage from a Senate document entitled "Monograph of the Attorney General's Committee on Administrative Procedure." S. Doc. No. 10, 77th Cong., 1st Sess., pt. 3, p. 39 (1941). The basic monograph itself is described as "embodying the results of the investigations made by the staff of said committee relative to the [administrative] practices and procedures of" several agencies of the Government. *Id.*, at II. Following the text of the monograph is the "Appendix," which in turn is described in a "Foreword" as follows: "This statement, developed from a report by the Bureau of Old-Age and Survivors Insurance making certain recommendations for the Board's consideration, describes the essential features of a hearing and review system which has been authorized by the Board and which is designed to meet both the statutory requirements and the social purposes of the old-age and survivors insurance program. It has been developed during several months under the leadership of Ralph F. Fuchs, professor of law, Washington University, St. Louis, Mo., a consultant of this Bureau, by whom the Bureau's report, in the main, was written." *Id.*, at 34. After the "Foreword" follows a three-part report in somewhat smaller type, the second of which parts is entitled "Considerations Affecting the Hearing and Review System." Within this second part, appears the language which MR. JUSTICE BRENNAN's dissent characterizes as "the reading which the Social

A somewhat more substantial argument that the third sentence of § 405 (h) does not deprive the District Court of federal-question jurisdiction relies on the fact that it only affects actions to recover on "any claim arising under [Title II]" of the Social Security Act.[7] The argument is that the present action arises under the Constitution and not under Title II. It would, of course, be fruitless to contend that appellees' claim is one which does not arise under the Constitution, since their constitutional arguments are critical to their complaint. But it is just as fruitless to argue that this action does not also arise under the Social Security Act. For not only is it Social Security benefits which appellees seek to recover, but it is the Social Security Act which provides

Security Board itself gave to the provision soon after it went into effect." *Post*, at 790.

We have some doubts that the report of a consultant can be properly characterized as incorporating the "reading which the Social Security Board itself gave" to this provision. Even if the report as a whole is stated to have been "approved" by the Board, there is no indication that such approval extends beyond the report's broad-brush conceptualization of "the essential features of a hearing and review system." In any event, we do not agree that an administrative agency's general discussion of a statute, occurring after its passage, and in a context which does not require it to focus closely on the operative impact of a particular provision, is either an important indicator of congressional intent, as the dissent suggests, *post*, at 792, or an authoritative source for the proposition that a provision serves a particular function. Finally, even if the report is an accurate reading of the Act, its significance goes only to whether the third sentence of § 405 (h) serves a function *in addition to* that which we believe it serves; the possibility that the District Court's interpretation renders the third sentence only largely superfluous rather than totally so is not sufficient to disturb our analysis of the role of that sentence in this case.

[7] Title II contains the old-age, survivors, and disability insurance programs codified at 42 U. S. C. § 401 *et seq.*

both the standing and the substantive basis for the presentation of their constitutional contentions. Appellees sought, and the District Court granted, a judgment directing the Secretary to pay Social Security benefits. To contend that such an action does not arise under the Act whose benefits are sought is to ignore both the language and the substance of the complaint and judgment. This being so, the third sentence of § 405 (h) precludes resort to federal-question jurisdiction for the adjudication of appellees' constitutional contentions.

It has also been argued that *Johnson* v. *Robison,* 415 U. S. 361 (1974), supports the proposition that appellees are not seeking to recover on a claim arising under Title II. In that case we considered 38 U. S. C. § 211 (a), which provides:

> "[T]he decisions of the [Veterans'] Administrator on any question of law or fact under any law administered by the Veterans' Administration providing benefits for veterans . . . shall be final and conclusive and no other official or any court of the United States shall have power or jurisdiction to review any such decision by an action in the nature of mandamus or otherwise."

We were required to resolve whether this language precluded an attack on the constitutionality of a statutory limitation. We concluded that it did not, basically because such a limitation was not a "decision" of the Administrator "on any question of law or fact"; indeed, the "decision" had been made by Congress, not the Administrator, and the issue was one which the Administrator considered to be beyond his jurisdiction. 415 U. S., at 367–368. Thus the question sought to be litigated was simply not within § 211 (a)'s express language, and there was accordingly no basis for conclud-

ing that Congress sought to preclude review of the constitutionality of veterans' legislation.

The language of § 405 (h) is quite different. Its reach is not limited to decisions of the Secretary on issues of law or fact. Rather, it extends to any "action" seeking "to recover on any [Social Security] claim"—irrespective of whether resort to judicial processes is necessitated by discretionary decisions of the Secretary or by his non-discretionary application of allegedly unconstitutional statutory restrictions.

There is another reason why *Johnson* v. *Robison* is inapposite. It was expressly based, at least in part, on the fact that if § 211 (a) reached constitutional challenges to statutory limitations, then absolutely no judicial consideration of the issue would be available. Not only would such a restriction have been extraordinary, such that "clear and convincing" evidence would be required before we would ascribe such intent to Congress, 415 U. S., at 373, but it would have raised a serious constitutional question of the validity of the statute as so construed. *Id.,* at 366–367. In the present case, as will be discussed below, the Social Security Act itself provides jurisdiction for constitutional challenges to its provisions. Thus the plain words of the third sentence of § 405 (h) do not preclude constitutional challenges. They simply require that they be brought under jurisdictional grants contained in the Act, and thus in conformity with the same standards which are applicable to nonconstitutional claims arising under the Act. The result is not only of unquestionable constitutionality, but it is also manifestly reasonable, since it assures the Secretary the opportunity prior to constitutional litigation to ascertain, for example, that the particular claims involved are neither invalid for other reasons nor allowable under other provisions of the Social Security Act.

As has been stated, the Social Security Act itself provides for district court review of the Secretary's determinations. Title 42 U. S. C. § 405 (g) provides that "[a]ny individual, after any final decision of the Secretary made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision . . . ." See n. 5, *supra*. The question with which we must now deal is whether this provision could serve as a jurisdictional basis for the District Court's consideration of the present case. We conclude that it provided jurisdiction only as to the named appellees and not as to the unnamed members of the class.[8]

Section 405 (g) specifies the following requirements for judicial review: (1) a final decision of the Secretary made after a hearing; (2) commencement of a civil action within 60 days after the mailing of notice of such decision (or within such further time as the Secretary

---

[8] Since § 405 (g) is the basis for district court jurisdiction, there is some question as to whether it had authority to enjoin the operation of the duration-of-relationship requirements. Section 405 (g) accords authority to affirm, modify, or reverse a decision of the Secretary. It contains no suggestion that a reviewing court is empowered to enter an injunctive decree whose operation reaches beyond the particular applicants before the court. In view of our dispositions of the class-action and constitutional issues in this case, the only significance of this problem goes to our own jurisdiction. If a § 405 (g) court is not empowered to enjoin the operation of a federal statute, then a three-judge District Court was not required to hear this case, 28 U. S. C. § 2282, and we are without jurisdiction under 28 U. S. C. § 1253. However, whether or not the three-judge court was properly convened, that court did hold a federal statute unconstitutional in a civil action to which a federal agency and officers are parties. We thus have direct appellate jurisdiction under 28 U. S. C. § 1252. *McLucas* v. *DeChamplain*, 421 U. S. 21, 31–32 (1975).

may allow); and (3) filing of the action in an appropriate district court, in general that of the plaintiff's residence or principal place of business. The second and third of these requirements specify, respectively, a statute of limitations and appropriate venue. As such, they are waivable by the parties, and not having been timely raised below, see Fed. Rules Civ. Proc. 8 (c), 12 (h)(1), need not be considered here. We interpret the first requirement, however, to be central to the requisite grant of subject-matter jurisdiction—the statute empowers district courts to review a particular type of decision by the Secretary, that type being those which are "final" and "made after a hearing."

In the present case, the complaint seeks review of the denial of benefits based on the plain wording of a statute which is alleged to be unconstitutional. That a denial on such grounds, which are beyond the power of the Secretary to affect, is nonetheless a decision of the Secretary for these purposes has been heretofore established. *Flemming* v. *Nestor,* 363 U. S. 603 (1960). As to class members, however, the complaint is deficient in that it contains no allegations that they have even filed an application with the Secretary, much less that he has rendered any decision, final or otherwise, review of which is sought. The class thus cannot satisfy the requirements for jurisdiction under 42 U. S. C. § 405 (g). Other sources of jurisdiction being foreclosed by § 405 (h), the District Court was without jurisdiction over so much of the complaint as concerns the class, and it should have entered an appropriate order of dismissal.

The jurisdictional issue with respect to the named appellees is somewhat more difficult. In a paragraph entitled "Exhaustion of Remedies," the complaint alleges that they fully presented their claims for benefits "to their district Social Security Office and, upon denial, to

the Regional Office for reconsideration." It further alleges that they have no dispute with the Regional Office's findings of fact or applications of statutory law, and that the only issue is a matter of constitutional law which is beyond the Secretary's competence. On their face these allegations with regard to exhaustion fall short of meeting the literal requirement of § 405 (g) that there shall have been a "final decision of the Secretary made after a hearing." They also fall short of satisfying the Secretary's regulations, which specify that the finality required for judicial review is achieved only after the further steps of a hearing before an administrative law judge and, possibly, consideration by the Appeals Council. See 20 CFR §§ 404.916, 404.940, 404.951 (1974).

We have previously recognized that the doctrine of administrative exhaustion should be applied with a regard for the particular administrative scheme at issue. *Parisi* v. *Davidson*, 405 U. S. 34 (1972); *McKart* v. *United States*, 395 U. S. 185 (1969). Exhaustion is generally required as a matter of preventing premature interference with agency processes, so that the agency may function efficiently and so that it may have an opportunity to correct its own errors, to afford the parties and the courts the benefit of its experience and expertise, and to compile a record which is adequate for judicial review. See, *e. g., id.,* at 193–194. Plainly these purposes have been served once the Secretary has satisfied himself that the only issue is the constitutionality of a statutory requirement, a matter which is beyond his jurisdiction to determine, and that the claim is neither otherwise invalid nor cognizable under a different section of the Act. Once a benefit applicant has presented his or her claim at a sufficiently high level of review to satisfy the Secretary's administrative needs, further exhaustion would not merely be futile for the applicant,

but would also be a commitment of administrative resources unsupported by any administrative or judicial interest.

The present case, of course, is significantly different from *McKart* in that a "final decision" is a statutorily specified jurisdictional prerequisite. The requirement is, therefore, as we have previously noted, something more than simply a codification of the judicially developed doctrine of exhaustion, and may not be dispensed with merely by a judicial conclusion of futility such as that made by the District Court here. But it is equally true that the requirement of a "final decision" contained in § 405 (g) is not precisely analogous to the more classical jurisdictional requirements contained in such sections of Title 28 as 1331 and 1332. The term "final decision" is not only left undefined by the Act, but its meaning is left to the Secretary to flesh out by regulation.[9] Section 405 (*l*) accords the Secretary complete authority to delegate his statutory duties to officers and employees of the Department of Health, Education, and Welfare. The statutory scheme is thus one in which the Secretary may specify such requirements for exhaustion as he deems serve his own interests in effective and efficient administration. While a court may not substitute its conclusion as to futility for the contrary conclusion of the Secretary, we believe it would be inconsistent with the congressional scheme to bar the Secretary from de-

---

[9] Title 42 U. S. C. § 405 (a):

"The Secretary shall have full power and authority to make rules and regulations and to establish procedures, not inconsistent with the provisions of this subchapter, which are necessary or appropriate to carry out such provisions, and shall adopt reasonable and proper rules and regulations to regulate and provide for the nature and extent of the proofs and evidence and the method of taking and furnishing the same in order to establish the right to benefits hereunder."

termining in particular cases that full exhaustion of internal review procedures is not necessary for a decision to be "final" within the language of § 405 (g).

Much the same may be said about the statutory requirement that the Secretary's decision be made "after a hearing." Not only would a hearing be futile and wasteful, once the Secretary has determined that the only issue to be resolved is a matter of constitutional law concededly beyond his competence to decide, but the Secretary may, of course, award benefits without requiring a hearing. We do not understand the statute to prevent him from similarly determining in favor of the applicant, without a hearing, all issues with regard to eligibility save for one as to which he considers a hearing to be useless.

In the present case the Secretary does not raise any challenge to the sufficiency of the allegations of exhaustion in appellees' complaint. We interpret this to be a determination by him that for the purposes of this litigation the reconsideration determination is "final." The named appellees thus satisfy the requirements for § 405 (g) judicial review, and we proceed to the merits of their claim.[10]

### III

The District Court relied on congressional history for the proposition that the duration-of-relationship requirement was intended to prevent the use of sham marriages to secure Social Security payments. As such, concluded the court, "the requirement constitutes a presumption that marriages like Mrs. Salfi's, which did not precede

---

[10] Section 405 (g) jurisdiction in *Weinberger* v. *Wiesenfeld,* 420 U. S. 636 (1975), was similarly present. In that case the Secretary stipulated that exhaustion would have been futile, and he did not make any contentions that Wiesenfeld had not complied with the requirements of § 405 (g). *Id.,* at 641 n. 8.

the wage earner's death by at least nine months, were entered into for the purpose of securing Social Security benefits." 373 F. Supp., at 965. The presumption was, moreover, conclusive, because applicants were not afforded an opportunity to disprove the presence of the illicit purpose. The court held that under our decisions in *Cleveland Board of Education* v. *LaFleur,* 414 U. S. 632 (1974); *Vlandis* v. *Kline,* 412 U. S. 441 (1973); and *Stanley* v. *Illinois,* 405 U. S. 645 (1972), the requirement was unconstitutional, because it presumed a fact which was not necessarily or universally true.

Our ultimate conclusion is that the District Court was wrong in holding the duration-of-relationship requirement unconstitutional. Because we are aware that our various holdings in related cases do not all sound precisely the same note, we will explain ourselves at some length.

The standard for testing the validity of Congress' Social Security classification was clearly stated in *Flemming* v. *Nestor,* 363 U. S., at 611:

> "Particularly when we deal with a withholding of a noncontractual benefit under a social welfare program such as [Social Security], we must recognize that the Due Process Clause can be thought to interpose a bar only if the statute manifests a patently arbitrary classification, utterly lacking in rational justification."

In *Richardson* v. *Belcher,* 404 U. S. 78 (1971), a portion of the Social Security Act which required an otherwise entitled disability claimant to be subjected to an "offset" by reason of his simultaneous receipt of state workmen's compensation benefits was attacked as being violative of the Due Process Clause of the Fifth Amendment. The claimant in that case asserted that the provision was arbitrary in that it required offsetting of a

state workmen's compensation payment, but not of a similar payment made by a private disability insurer. The Court said:

"If the goals sought are legitimate, and the classification adopted is rationally related to the achievement of those goals, then the action of Congress is not so arbitrary as to violate the Due Process Clause of the Fifth Amendment." 404 U. S., at 84.

Two Terms earlier the Court had decided the case of *Dandridge* v. *Williams,* 397 U. S. 471 (1970), in which it rejected a claim that Maryland welfare legislation violated the Equal Protection Clause of the Fourteenth Amendment. The Court had said:

"In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some 'reasonable basis,' it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality.' *Lindsley* v. *Natural Carbonic Gas Co.,* 220 U. S. 61, 78. 'The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific.' *Metropolis Theatre Co. v. City of Chicago,* 228 U. S. 61, 69–70. . . .

"To be sure, the cases cited, and many others enunciating this fundamental standard under the Equal Protection Clause, have in the main involved state regulation of business or industry. The administration of public welfare assistance, by contrast, involves the most basic economic needs of impoverished human beings. We recognize the dramatically real factual difference between the cited cases and this one, but we can find no basis for applying a

different constitutional standard. . . . It is a standard that has consistently been applied to state legislation restricting the availability of employment opportunities. *Goesaert* v. *Cleary,* 335 U. S. 464; *Kotch* v. *Board of River Port Pilot Comm'rs,* 330 U. S. 552. See also *Flemming* v. *Nestor,* 363 U. S. 603. And it is a standard that is true to the principle that the Fourteenth Amendment gives the federal courts no power to impose upon the States their views of what constitutes wise economic or social policy." *Id.,* at 485–486.

The relation between the equal protection analysis of *Dandridge* and the Fifth Amendment due process analysis of *Flemming* v. *Nestor* and *Richardson* v. *Belcher* was described in the latter case in this language:

"A statutory classification in the area of social welfare is consistent with the Equal Protection Clause of the Fourteenth Amendment if it is 'rationally based and free from invidious discrimination.' *Dandridge* v. *Williams,* 397 U. S. 471, 487. While the present case, involving as it does a federal statute, does not directly implicate the Fourteenth Amendment's Equal Protection Clause, a classification that meets the test articulated in *Dandridge* is perforce consistent with the due process requirement of the Fifth Amendment. Cf. *Bolling* v. *Sharpe,* 347 U. S. 497, 499." 404 U. S., at 81.

These cases quite plainly lay down the governing principle for disposing of constitutional challenges to classifications in this type of social welfare legislation. The District Court, however, chose to rely on *Cleveland Board of Education* v. *LaFleur, supra; Vlandis* v. *Kline, supra;* and *Stanley* v. *Illinois, supra.* It characterized this recent group of cases as dealing with "the appropriateness

of conclusive evidentiary presumptions." 373 F. Supp., at 965.

*Stanley* v. *Illinois* held that it was a denial of the equal protection guaranteed by the Fourteenth Amendment for a State to deny a hearing on parental fitness to an unwed father when such a hearing was granted to all other parents whose custody of their children was challenged. This Court referred to the fact that the "rights to conceive and to raise one's children have been deemed 'essential,' *Meyer* v. *Nebraska,* 262 U. S. 390, 399 (1923), 'basic civil rights of man,' *Skinner* v. *Oklahoma,* 316 U. S. 535, 541 (1942), and '[r]ights far more precious . . . than property rights,' *May* v. *Anderson,* 345 U. S. 528, 533 (1953)." 405 U. S., at 651.

In *Vlandis* v. *Kline,* a statutory definition of "residents" for purposes of fixing tuition to be paid by students in a state university system was held invalid. The Court held that where Connecticut purported to be concerned with residency, it might not at the same time deny to one seeking to meet its test of residency the opportunity to show factors clearly bearing on that issue. 412 U. S., at 452.

In *LaFleur* the Court held invalid, on the authority of *Stanley* and *Vlandis,* school board regulations requiring pregnant school teachers to take unpaid maternity leave commencing four to five months before the expected birth. The Court stated its longstanding recognition "that freedom of personal choice in matters of marriage and family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment," 414 U. S., at 639–640, and that "overly restrictive maternity leave regulations can constitute a heavy burden on the exercise of these protected freedoms." *Id.,* at 640.

We hold that these cases are not controlling on the issue before us now. Unlike the claims involved in

*Stanley* and *LaFleur,* a noncontractual claim to receive funds from the public treasury enjoys no constitutionally protected status, *Dandridge* v. *Williams, supra,* though of course Congress may not invidiously discriminate among such claimants on the basis of a "bare congressional desire to harm a politically unpopular group," *U. S. Dept. of Agriculture* v. *Moreno,* 413 U. S. 528, 534 (1973), or on the basis of criteria which bear no rational relation to a legitimate legislative goal. *Jimenez* v. *Weinberger,* 417 U. S. 628, 636 (1974); *U. S. Dept. of Agriculture* v. *Murry,* 413 U. S. 508, 513–514 (1973). Unlike the statutory scheme in *Vlandis,* 412 U. S., at 449, the Social Security Act does not purport to speak in terms of the bona fides of the parties to a marriage, but then make plainly relevant evidence of such bona fides inadmissible. As in *Starns* v. *Malkerson,* 326 F. Supp. 234 (Minn. 1970), summarily aff'd, 401 U. S. 985 (1971), the benefits here are available upon compliance with an objective criterion, one which the Legislature considered to bear a sufficiently close nexus with underlying policy objectives to be used as the test for eligibility. Like the plaintiffs in *Starns,* appellees are completely free to present evidence that they meet the specified requirements; failing in this effort, their only constitutional claim is that the test they cannot meet is not so rationally related to a legitimate legislative objective that it can be used to deprive them of benefits available to those who do satisfy that test.

We think that the District Court's extension of the holdings of *Stanley, Vlandis,* and *LaFleur* to the eligibility requirement in issue here would turn the doctrine of those cases into a virtual engine of destruction for countless legislative judgments which have heretofore been thought wholly consistent with the Fifth and Fourteenth Amendments to the Constitution. For example, the very

section of Title 42 which authorizes an action such as this, § 405 (g), requires that a claim be filed within 60 days after administrative remedies are exhausted. It is indisputable that this requirement places people who file their claims more than 60 days after exhaustion in a different "class" from people who file their claims within the time limit. If we were to follow the District Court's analysis, we would first try to ascertain the congressional "purpose" behind the provision, and probably would conclude that it was to prevent stale claims from being asserted in court. We would then turn to the questions of whether such a flat cutoff provision was necessary to protect the Secretary from stale claims, whether it would be possible to make individualized determinations as to any prejudice suffered by the Secretary as the result of an untimely filing, and whether or not an individualized hearing on that issue should be required in each case. This would represent a degree of judicial involvement in the legislative function which we have eschewed except in the most unusual circumstances, and which is quite unlike the judicial role mandated by *Dandridge, Belcher,* and *Nestor,* as well as by a host of cases arising from legislative efforts to regulate private business enterprises.

In *Williamson* v. *Lee Optical Co.,* 348 U. S. 483 (1955), the Court dealt with a claim that the Equal Protection Clause of the Fourteenth Amendment was violated by an Oklahoma statute which subjected opticians to a system of detailed regulation, but which exempted sellers of ready-to-wear glasses. In sustaining the statute the Court said:

> "The problem of legislative classification is a perennial one, admitting of no doctrinaire definition. Evils in the same field may be of different dimensions and proportions, requiring different remedies. Or so the legislature may think." *Id.,* at 489.

More recently, in *Mourning* v. *Family Publications Service, Inc.*, 411 U. S. 356 (1973), the Court sustained the constitutionality of a regulation promulgated under the Truth in Lending Act which made the Act's disclosure provisions applicable whenever credit is offered to a consumer " 'for which either a finance charge is or may be imposed or which pursuant to an agreement, is or may be payable in more than four installments.' " *Id.,* at 362. The regulation was challenged because it was said to conclusively presume that payments made under an agreement providing for more than four instalments necessarily included a finance charge, when in fact that might not be the case. The Court rejected the constitutional challenge in this language:

> "The rule was intended as a prophylactic measure; it does not presume that all creditors who are within its ambit assess finance charges, but, rather, imposes a disclosure requirement on all members of a defined class in order to discourage evasion by a substantial portion of that class." *Id.,* at 377.

If the Fifth and Fourteenth Amendments permit this latitude to legislative decisions regulating the private sector of the economy, they surely allow no less latitude in prescribing the conditions upon which funds shall be dispensed from the public treasury. *Dandridge* v. *Williams, supra.* With these principles in mind, we turn to consider the statutory provisions which the District Court held invalid.

Title 42 U. S. C. § 402 (1970 ed. and Supp. III) is the basic congressional enactment defining eligibility for old-age and survivors insurance benefit payments, and is divided into 23 lettered subsections. Subsection (g) is entitled "Mother's insurance benefits," and primarily governs the claim of appellee Salfi. Subsection (d) governs eligibility for child's insurance benefits, and is the pro-

vision under which appellee Kalnins makes her claim. These subsections, along with others in § 402, specify the types of social risks for which protection is provided by what is basically a statutory insurance policy.

A different insurance system, but similarly defined by statute and operated by a governmental entity, was the subject of our consideration in *Geduldig* v. *Aiello,* 417 U. S. 484 (1974), and our disposition of that case is instructive. We reversed the judgment of a District Court which had held that a California state disability insurance program was invalid insofar as it failed to provide benefits for disabilities associated with normal pregnancy. In our opinion we said:

"The District Court suggested that moderate alterations in what it regarded as 'variables' of the disability insurance program could be made to accommodate the substantial expense required to include normal pregnancy within the program's protection. The same can be said, however, with respect to the other expensive class of disabilities that are excluded from coverage—short-term disabilities. If the Equal Protection Clause were thought to compel disability payments for normal pregnancy, it is hard to perceive why it would not also compel payments for short-term disabilities suffered by participating employees.

"It is evident that a totally comprehensive program would be substantially more costly than the present program and would inevitably require state subsidy, a higher rate of employee contribution, a lower scale of benefits for those suffering insured disabilities, or some combination of these measures. There is nothing in the Constitution, however, that requires the State to subordinate or compromise its legitimate interests solely to create

a more comprehensive social insurance program than it already has." *Id.*, at 495–496.

The present case is somewhat different, since the Secretary principally defends the duration-of-relationship requirement, not as a reasonable legislative decision to exclude a particular type of risk from coverage, but instead as a method of assuring that payments are made only upon the occurrence of events the risk of which is covered by the insurance program.[11]   Commercial insurance policies have traditionally relied upon fixed, prophylactic rules to protect against abuses which could expand liability beyond the risks which are within the general concept of its coverage.   For example, life insurance policies often cover deaths by suicide, but not those suicides which were contemplated when the policy was purchased.   Frequently the method chosen to contain liability within these conceptual bounds is a strict rule that deaths by suicide are covered if, and only if, they occur some fixed period of time after the policy is issued. See, *e. g.*, 9 G. Couch, Cyclopedia of Insurance Law § 40.50 (2d ed. 1962).   While such a limitation doubtless proves in particular cases to be "under-inclusive" or "over-inclusive," in light of its presumed purpose, it is nonetheless a widely accepted response to legitimate interests in administrative economy and certainty of coverage for those who meet its terms.   When the Government chooses to follow this tradition in its own social insurance programs, it does not come up against a constitutional stone wall.   Rather, it may rely on such rules so long as

---

[11] The Secretary also briefly argues that the duration-of-relationship requirement rationally serves the interest in providing benefits only for persons who are likely to have become dependent upon the wage earner.   Brief for Appellants 11–12.   In view of our conclusion with regard to his principal argument, we need not consider this justification.

they comport with the standards of legislative reasonableness enunciated in cases like *Dandridge* v. *Williams* and *Richardson* v. *Belcher*.

Under those standards, the question raised is not whether a statutory provision precisely filters out those, and only those, who are in the factual position which generated the congressional concern reflected in the statute. Such a rule would ban all prophylactic provisions, and would be directly contrary to our holding in *Mourning, supra*. Nor is the question whether the provision filters out a substantial part of the class which caused congressional concern, or whether it filters out more members of the class than nonmembers. The question is whether Congress, its concern having been reasonably aroused by the possibility of an abuse which it legitimately desired to avoid, could rationally have concluded both that a particular limitation or qualification would protect against its occurrence, and that the expense and other difficulties of individual determinations justified the inherent imprecision of a prophylactic rule. We conclude that the duration-of-relationship test meets this constitutional standard.

The danger of persons entering a marriage relationship not to enjoy its traditional benefits, but instead to enable one spouse to claim benefits upon the anticipated early death of the wage earner, has been recognized from the very beginning of the Social Security program. While no early legislative history addresses itself specifically to the duration-of-relationship requirement for mother's and child's benefits, there were discussions of the analogous requirement for receipt of wife's benefits under § 402 (b). See 42 U. S. C. § 416 (b) (1970 ed., Supp. IV), defining "wife." Dr. A. J. Altmeyer, Chairman of the Social Security Board, noted that a five-year requirement "should be strict enough to prevent marriage in anticipa-

tion of the larger benefit payments." Hearings on Social Security before the House Committee on Ways and Means, 76th Cong., 1st Sess., vol. 3, p. 2297 (1939). Similarly, the Advisory Council on Social Security stated:

> "The requirement that the wives' allowance be payable only where marital status existed prior to the husband's attainment of age 60 is intended to serve as protection against abuse of the plan through the contracting of marriages solely for the purpose of acquiring enhanced benefits. If the marriage takes place at least 5 years before any old-age benefits can be paid, a reasonable assumption exists that it was contracted in good faith." *Id.,* vol. 1, p. 31.

The Advisory Council also stated, with regard to § 402 (e) widow's benefits which, like mother's benefits, depend on the § 416 (c) definition of "widow":

> "As in the case of wives' allowances, it is believed desirable to protect the provisions for widows' benefits against abuse by the requirement of a minimum period of marital status." *Id.,* at 32.

Similar concerns were reflected in the House and Senate Reports on the 1946 amendment which reduced to three years the required duration of a marriage for the purposes of an eligible "wife." It was stated:

> "The original provision was intended to prevent exploitation of the fund by claims for benefits from persons who married beneficiaries solely to get wife's benefits. Experience has shown that the requirement is unnecessarily restrictive for this purpose and that, in a number of cases, a wife is permanently barred from benefits even though the marriage was entered into many years before the wage earner became a beneficiary. The amendment, taken with the provision in section 202 (b) that the wife be

living with her husband in order to be eligible for benefits, should be sufficient protection for the trust fund and will remedy situations which now seem inequitable. Few persons are likely to marry because of the prospect of receiving a modest insurance benefit which will not be payable until after 3 years." H. R. Rep. No. 2526, 79th Cong., 2d Sess., 25; S. Rep. No. 1862, 79th Cong., 2d Sess., 33.

Later amendments to the Act have been accompanied by discussions of the duration-of-relationship requirements contained in the definitions of "widow" and "child." Like the early history of analogous requirements, they reflect congressional concern with the possibility of relationships entered for the purpose of obtaining benefits. In 1967, when the durational period was reduced from one year to nine months, the House Report stated:

"Your committee's bill would reduce the duration-of-relationship requirements for widows, widowers, and stepchildren of deceased workers from 1 year to 9 months. The present law contains a 1-year duration-of-relationship requirement which was adopted as a safeguard against the payment of benefits where a relationship was entered into in order to secure benefit rights. While the present requirements have generally worked out satisfactorily, situations have been called to the committee's attention in which benefits were not payable because the required relationship had existed for somewhat less than 1 year. Although some duration-of-relationship requirement is appropriate, a less stringent requirement would be adequate." H. R. Rep. No. 544, 90th Cong., 1st Sess., 56.

When in 1972 Congress added the provisions of 42 U. S. C. § 416 (k)(2) (1970 ed., Supp. III) (eliminating

the nine-month requirement with respect to remarriages of persons who had previously been married for more than nine months), the House Report observed: "This duration-of-relationship requirement is included in the law as a general precaution against the payment of benefits where the marriage was undertaken to secure benefit rights." H. R. Rep. No. 92–231, p. 55 (1971).

Undoubtedly the concerns reflected in this congressional material are legitimate, involving as they do the integrity of both the Social Security Trust Fund and the marriage relationship. It is also undoubtedly true that the duration-of-relationship requirement operates to lessen the likelihood of abuse through sham relationships entered in contemplation of imminent death. We also think that Congress could rationally have concluded that any imprecision from which it might suffer was justified by its ease and certainty of operation.

We note initially that the requirement is effective only within a somewhat narrow range of situations lacking certain characteristics which might reasonably be thought to establish the genuineness of a marital relationship which involves children (and thus the potential for mother's and child's benefits). Even though a surviving wife has not been married for a period of nine months immediately prior to her husband's death, she is nonetheless within the definition of "widow" if she meets one of the other disjunctive requirements of § 416 (c). If she is the mother of her late husband's son or daughter; if she legally adopted his son or daughter while she was married to him and while such son or daughter was under the age of 18; if he legally adopted her son or daughter under the same circumstances; or if during their marriage, however short, they legally adopted a child under the age of 18—in any of these circumstances the surviving wife may claim widow's or mother's benefits

even though she has not been married to her husband for a full nine months.[12] The common denominator of these disjunctive requirements appears to us to be the assumption of responsibilities normally associated with marriage, and we think that Congress has treated them as alternative *indicia* of the fact that the marriage was entered into for a reason other than the desire to shortly acquire benefits. The marriages in which the widow must depend on qualifying under the nine-month requirement are those in which none of these other objective evidences of the assumption of marital responsibilities are present.

Even so, § 416 (c) (5) undoubtedly excludes some surviving wives who married with no anticipation of shortly becoming widows, and it may be that appellee Salfi is among them. It likewise may be true that the requirement does not filter out every such claimant, if a wage earner lingers longer than anticipated, or in the case of illnesses which can be recognized as terminal more than nine months prior to death. But neither of these facts necessarily renders the statutory scheme unconstitutional.

While it is possible to debate the wisdom of excluding legitimate claimants in order to discourage sham relationships, and of relying on a rule which may not exclude some obviously sham arrangements, we think it clear that Congress could rationally choose to adopt such a course. Large numbers of people are eligible for these programs and are potentially subject to inquiry as to the validity of their relationships to wage earners. These people include not only the classes which appellees represent,[13] but also claimants in other programs for which

---

[12] Similarly, the natural or adopted child of a deceased wage earner need not meet the nine-month requirement. See 42 U. S. C. § 416 (e) (1) (1970 ed., Supp. III).

[13] According to the Social Security Administration, in calendar 1973 there were 125,000 applicants for mother's benefits, 1,313,000

the Social Security Act imposes duration-of-relationship requirements.[14]   Not only does the prophylactic approach thus obviate the necessity for large numbers of individualized determinations, but it also protects large numbers of claimants who satisfy the rule from the uncertainties and delays of administrative inquiry into the circumstances of their marriages.   Nor is it at all clear that individual determinations could effectively filter out sham arrangements, since neither marital intent, life expectancy, nor knowledge of terminal illness has been shown by

---

for child's benefits, and 403,000 for widow's/widower's benefits. While these figures include large numbers of persons who qualify on bases other than the duration of their relationship with a wage earner, they also doubtlessly exclude persons who did not even apply because of the durational restriction, or who were thereby dissuaded from entering the relationship.   A feel for the magnitude of the potential for case-by-case determinations can also be developed by reference to the Social Security Administration's estimate that judgment for the class which the named appellees sought to represent would involve payments of $30 million, assuming retroactivity to 1967.   This figure does not reflect payments in behalf of persons who met the objective nine-month requirement, or who could not meet it and therefore either never applied or never entered the relationship.

[14] See 42 U. S. C. §§ 416 (b), (f), and (g), defining "wife," "husband," and "widower."   These various definitions impose duration-of-relationship requirements with regard to "wife's" benefits, 42 U. S. C. § 402 (b) (1970 ed. and Supp. III), "husband's" benefits, 42 U. S. C. § 402 (c), and "widower's" benefits, 42 U. S. C. § 402 (f) (1970 ed. and Supp. III).   In addition, "widow's" benefits, 42 U. S. C. § 402 (e) (1970 ed. and Supp. III), are available only to those women who satisfy § 416 (c)'s definition of "widow."   "Parent's" benefits, 42 U. S. C. § 402 (h), are also subject to an objective eligibility requirement which is similar to a duration-of-relationship requirement. Under § 402 (h)(3), stepparents and adoptive parents may receive benefits with respect to a deceased child who was providing at least half of their support, but only if the marriage or adoption creating their relationship occurred prior to the child's 16th birthday.

appellees to be reliably determinable.[15]   Finally, the very possibility of prevailing at a hearing could reasonably be expected to encourage sham relationships.

---

[15] Appellees do not contend that marital intent or life expectancy can be reliably determined.  They argue, however, that because a marriage could not be entered in contemplation of imminent death unless the wage earner's "terminal illness" was known, the inquiry need go no farther than the issue of whether the parties to the marriage knew of such an illness.  They claim that applicants could demonstrate the state of their knowledge by physicians' affidavits or documentary medical evidence.  These contentions are not, however, supported by any factual rebuttals of the variety of difficulties which Congress was entitled to expect to be encountered. See *McGowan* v. *Maryland*, 366 U. S. 420, 426 (1961).

For example, all evidence of "knowledge of terminal illness" would ordinarily be under the control of applicants, which suggests that they should bear the burden of proof.  But this burden could be convincingly carried only with respect to wage earners who happened to have had physical examinations shortly before their weddings; on the other hand, awarding benefits where the wage earner had not had an examination, and no medical evidence was available, would encourage participants in sham arrangements to conceal their own adverse medical evidence.  Even when adequate medical evidence was available there could easily be difficulties in determining whether a wage earner's physical condition amounted to a "terminal illness"; if that concept were restricted to conditions which were virtually certain to result in an early death, benefits would probably be too broadly available, since certainty of imminent death rather than a mere high probability of it is not a prerequisite to a sham relationship; yet inquiries into the degree of likelihood of death could become very complex indeed.

Additional problems with appellees' proposed test arise because it, like the duration-of-relationship requirement, is not precisely related to the objective of denying benefits which are sought on the basis of sham relationships.  In the first place, it presumably would be necessary to limit the requirement of terminal illness inquiries to instances in which death occurred within a specified period after marriage.  It would also appear to be necessary to set an outside limit on the length of the period within which death was expected that would disqualify applicants (after all, and paraphrasing Lord Keynes, in the long run we are all expected to die).  Yet there will

The administrative difficulties of individual eligibility determinations are without doubt matters which Congress may consider when determining whether to rely on rules which sweep more broadly than the evils with which they seek to deal. In this sense, the duration-of-relationship requirement represents not merely a substantive policy determination that benefits should be awarded only on the basis of genuine marital relationships, but also a substantive policy determination that limited resources would not be well spent in making individual determinations. It is an expression of Congress' policy choice that the Social Security system, and its millions of beneficiaries, would be best served by a prophylactic rule which bars claims arising from the bulk of sham marriages which are actually entered, which discourages such mar-

always be persons on one side of such lines who are seriously disadvantaged vis-à-vis persons on the other side. More basically, appellees' test would clearly exclude persons who knew of a wage earner's imminent death, but who entered their marriages for reasons entirely unrelated to Social Security benefits, such as to fulfill the promises of a longstanding engagement. Thus appellees' proposed test would be subject to exactly the same constitutional attacks which they direct toward the test on which Congress chose to rely.

Appellees point out that 42 U. S. C. § 416 (k) (1970 ed., Supp. III) provides for limited exceptions to the duration-of-relationship requirement, unless the Secretary determines that at the time of the marriage the wage earner "could not have reasonably been expected to live for nine months." They argue that this represents Congress' recognition that case-by-case consideration would not impose an inordinate administrative burden. The argument is without merit. Section 416 (k) expresses Congress' willingness to accept case-by-case inquiries with regard to limited classes which bear particular indices of genuineness (the section is applicable in cases of accidental death, death in the line of military duty, and remarriages of persons previously married for more than nine months). This says nothing about the feasibility of making such inquiries in other circumstances, much less the rationality of choosing not to do so.

riages from ever taking place, and which is also objective and easily administered.

The Constitution does not preclude such policy choices as a price for conducting programs for the distribution of social insurance benefits. Cf. *Geduldig* v. *Aiello,* 417 U. S., at 496. Unlike criminal prosecutions, or the custody proceedings at issue in *Stanley* v. *Illinois,* such programs do not involve affirmative Government action which seriously curtails important liberties cognizable under the Constitution. There is thus no basis for our requiring individualized determinations when Congress can rationally conclude not only that generalized rules are appropriate to its purposes and concerns, but also that the difficulties of individual determinations outweigh the marginal increments in the precise effectuation of congressional concern which they might be expected to produce.

The judgment of the District Court is

*Reversed.*

MR. JUSTICE DOUGLAS, dissenting.

I agree with MR. JUSTICE BRENNAN that because there is clearly jurisdiction the Court's extended discussion of the subject is unwarranted.

On the merits, I believe that the main problem with these legislatively created presumptions is that they frequently invade the right to a jury trial. See *Tot* v. *United States,* 319 U. S. 463, 473 (1943) (Black, J., concurring). The present law was designed to bar payment of certain Social Security benefits when the purpose of the marriage was to obtain such benefits. Whether this was the aim of a particular marriage is a question of fact, to be decided by the jury in an appropriate case. I therefore would vacate and remand the case to give Mrs. Salfi the right to show that her

marriage did not offend the statutory scheme, that it was not a sham.

Mr. Justice Brennan, with whom Mr. Justice Marshall joins, dissenting.

The District Court did not err, in my view, either in holding that it had jurisdiction by virtue of 28 U. S. C. § 1331, or in holding that the nine-month requirements of 42 U. S. C. §§ 416 (c)(5) and (e)(2) (1970 ed. and Supp. III) are constitutionally invalid.

I

*Jurisdiction*

The jurisdictional issue to which the Court devotes 10 pages, only to conclude that there is indeed jurisdiction over the merits of this case both here and in the District Court, was not raised in this Court by the parties before us nor argued, except most peripherally,[1] in the briefs or

---

[1] The appellants in their jurisdictional statement raised as one of the questions presented "[w]hether sovereign immunity bars this [suit] *insofar as it seeks retroactive social security benefits.*" Jurisdictional Statement 2 (emphasis added). Their argument was that no retroactive benefits were available to the class, because 28 U. S. C. § 1331 does not waive sovereign immunity, because 42 U. S. C. § 405 (h) bars a suit *seeking retroactive benefits* except under § 405 (g), and because the exhaustion requirements of § 405 (g) were not met. Brief for Appellants 16–18. See also Tr. of Oral Arg. 7–8:

"Question: . . . [I]s the United States satisfied there was jurisdiction in the district court here?

"Mrs. Shapiro: We are not satisfied that there was jurisdiction to *the extent that it . . . identified a class and required retroactive payments to all members of the class.*" (Emphasis added.)

Thus, the appellants never claimed here that the District Court was without jurisdiction over the merits of this case, for they conceded, apparently, jurisdiction to grant declaratory and injunctive relief.

at oral argument. The question involves complicated questions of legislative intent and a statutory provision, 42 U. S. C. § 405 (h), which has baffled district courts and courts of appeals for years in this and other contexts.[2] Of course, this Court is always obliged to inquire into its own jurisdiction, when there is a substantial question about whether jurisdiction is proper either in the lower courts or in this Court. But since here there is, according to the Court, jurisdiction over the cause of action in any event,[3] I would have thought it the wiser

---

[2] See, e. g., on the effect of §§ 405 (g) and (h) on cases seeking to invalidate as unconstitutional a provision of Title II of the Social Security Act, *Bartley* v. *Finch*, 311 F. Supp. 876 (ED Ky. 1970), summarily aff'd on the merits *sub nom. Bartley* v. *Richardson*, 404 U. S. 980 (1971); *Gainville* v. *Richardson*, 319 F. Supp. 16 (Mass. 1970); *Griffin* v. *Richardson*, 346 F. Supp. 1226 (Md.), summarily aff'd, 409 U. S. 1069 (1972); *Diaz* v. *Weinberger*, 361 F. Supp. 1 (SD Fla. 1973); *Wiesenfeld* v. *Weinberger*, 367 F. Supp. 981 (NJ 1973), aff'd, 420 U. S. 636 (1975); *Kohr* v. *Weinberger*, 378 F. Supp. 1299 (ED Pa. 1974) (appeal docketed, No. 74–5538).

*Bartley* v. *Finch, supra,* was the only one of these cases holding that § 405 (g) is the *exclusive* means of determining the constitutionality of a provision of the Social Security Act, and that there was, because of noncompliance with § 405 (g), no jurisdiction. The District Court then went on to decide the merits. This Court's affirmance was explicitly on the merits, and thus must be taken to have held that there *was* jurisdiction even though § 405 (g) was not complied with.

Other courts have grappled with §§ 405 (g) and (h) in other contexts. See, e. g., *Filice* v. *Celebrezze*, 319 F. 2d 443 (CA9 1963); compare *Cappadora* v. *Celebrezze*, 356 F. 2d 1 (CA2 1966), with *Stuckey* v. *Weinberger*, 488 F. 2d 904 (CA9 1973) (en banc). In *Cappadora, supra,* Judge Friendly, in considering the application of §§ 405 (g) and (h) to review of a decision not to reopen a claim of statutory qualification, cautioned against overly literal interpretation of the sections. 356 F. 2d, at 4–5.

[3] If the Court had determined to affirm on the merits, then the question actually raised by the appellants—whether there is jurisdiction to award retroactive benefits despite noncompliance with

course merely to note that there was jurisdiction in the District Court *either* under 28 U. S. C. § 1331 *or* under 42 U. S. C. § 405 (g), leaving the resolution of the question of which is applicable to a case in which the decision is of some consequence, and in which the parties have, either of their own volition or upon request of the Court, briefed and argued the issue.[4] Surely, the Court does not intend to adopt a new policy of always on its own canvassing, with a full discussion, all jurisdictional issues lurking behind every case, whether or not the issue has any impact at all on the resolution of the case.

Because the Court nonetheless treats the question fully, I am obliged to do so as well. For, at least insofar as my own research and consideration, unaided by the help ordinarily offered by adversary consideration, is adequate, I am convinced that the Court is quite wrong about the intended reach of § 405 (h), and that its construction attributes to Congress a purpose both contrary

---

§ 405 (g)—may have been fairly before us, and may have entailed canvassing the jurisdictional questions the Court today discusses. But since the Court reverses on the merits, the *source* of the District Court's jurisdiction is immaterial and, particularly, it is irrelevant whether or not there was jurisdiction over the class complaint. The Court's decision on the latter question, *ante*, at 764, can only be characterized as dictum.

[4] In *Norton* v. *Weinberger*, appeal docketed, No. 74–6212, the District Court did not declare the contested portion of Title II of the Social Security Act unconstitutional, and we therefore lack jurisdiction under 28 U. S. C. § 1252. Thus, if § 405 (g) is the exclusive route for determination of constitutional attacks on Title II, and if, as the Court suggests, *ante*, at 763 n. 8, there is a question regarding the power of a court to grant an injunction under § 405 (g), we could be without jurisdiction under 28 U. S. C. § 1253 in *Norton* because the three-judge court, without power to enjoin the statute, was improperly convened under 28 U. S. C. § 2282. Thus, *Norton*, unlike this case, would be the appropriate vehicle for determination of the jurisdictional question decided today.

to all established notions of administrative exhaustion and absolutely without support in the clear language or legislative history of the statute. Further, today's decision is in square conflict with *Johnson* v. *Robison,* 415 U. S. 361 (1974). And finally, even if § 405 (ḡ) is the exclusive route for adjudicating actions seeking payment of a claim, I do not see how it can apply to the declaratory and injunctive aspects of this suit.

## A

The Court rejects the District Court's conclusion that § 405 (h) is no more than a codified requirement of administrative exhaustion on the basis of the third sentence of the section, which it characterizes as "sweeping and direct and [stating] that *no* action shall be brought under § 1331, not merely that only those actions shall be brought in which administrative remedies have been exhausted." *Ante,* at 757. But the sentence does not say that no action of any kind shall be brought under § 1331, or other general grants of jurisdiction, which may result in entitling someone to benefits under Title II of the Act; it says merely that no action shall be brought under § 1331 *et seq.* "to *recover* on any claim *arising under* [Title II]." (Emphasis added.) This action, I believe, does not "arise under" Title II in the manner intended by § 405 (h), and it is, at least in part, not an action to "recover" on a claim. See Parts B and C, *infra.*

Section 405 (h), I believe, only bans, except under § 405 (g), suits which arise under Title II in the sense that they require the application of the statute to a set of facts, and which seek nothing more than a determination of eligibility claimed to arise under the Act. Thus, I basically agree with the District Court that § 405 (h), including its last sentence, merely codifies the usual

requirements of administrative exhaustion. The last sentence, in particular, provides that a plaintiff cannot avoid § 405 (g) and the first two sentences of § 405 (h) by bringing an action under a general grant of jurisdiction claiming that the Social Security Act *itself* provides him certain rights. Rather, on *such* a claim a plaintiff *must* exhaust administrative remedies, and the District Court is limited to *review* of the Secretary's decision, in the manner prescribed by § 405 (g).

The Court suggests that this reading of § 405 (h) makes the last sentence redundant. But this is the reading which the Social Security Board itself gave to the provision soon after it went into effect. In a document prepared for and approved by the Board in January 1940 as an outline of the procedures to be followed under the newly enacted Social Security Act Amendments of 1939,[5] the interaction between §§ 405 (g) and (h) is described as follows:

> "The judicial review section of the act, section [405 (g)], provides for civil suits against the Social Security Board in the United States District Courts. These may be filed by parties to hearings before the Board who are dissatisfied with final decisions of the Board. The review of the Board's actions in these suits will consist of a review of the Board's records in these cases. *Thus, on the one hand, the Board is protected against the possibility of reversals of its decisions in separate actions filed for the purpose . . . . Actions of this kind are specifically excluded by section* [405 (h)]. On the other hand, judicial review

---

[5] Sections 405 (g) and (h) were part of these amendments. See Social Security Act Amendments of 1939. Tit. II, § 201, 53 Stat. 1362. Before that, the Social Security Act contained no explicit provisions concerning judicial review. See H. R. Rep. No. 728, 76th Cong., 1st Sess., 43 (1939).

on the basis of the Board's records in the cases makes it necessary that the record in each case be in the best possible state so as to avoid difficulties if a challenge in court occurs." Federal Security Agency, Social Security Board, Basic Provisions Adopted by the Social Security Board for the Hearing and Review of Old-Age and Suvivors Insurance Claims With a Discussion of Certain Administrative Problems and Legal Consideration (1940), in Attorney General's Committee on Administrative Procedure, Administrative Procedures in Government Agencies, S. Doc. No. 10, 77th Cong., 1st Sess., pt. 3, p. 39 (1941).

Since the last sentence of § 405 (h) is the only part of the section which "specifically exclude[s]" any "action," the italicized portion obviously refers to that sentence.

Thus, the agency responsible for the enforcement of Title II adopted a construction of the statute which gave the last sentence the very meaning which the Court now rejects as "superfluous" and "already performed by other statutory provisions." *Ante*, at 757, 759, and n. 6. As explained in the margin,[6] the sentence is not superfluous,

---

[6] The Court argues, *ante*, at 759 n. 6, that if the third sentence of § 405 (h) merely forbids a bypass of § 405 (g) via a separate action not framed as a review of the Secretary's decision, it is superfluous because an application is a prerequisite to entitlement and "[o]nce the application is filed, it is either approved . . . or it is denied," resulting in a decision of the Secretary which, under the second sentence of § 405 (h), cannot be reviewed "save pursuant to § 405 (g)." This analysis is faulty in several respects. First, without the last sentence of § 405 (h), an applicant might first file an application and then, before it is acted upon at all, file a suit for benefits under Title II. Second, it is not true that *all* entitlement to benefits hinge upon filing an application. In some instances, a person already receiving one type of benefits need not file a new application in order to receive another category of benefits. See, *e. g.*,

and the Board obviously did not regard it as such. Administrative interpretations by agencies of statutes which they administer are ordinarily entitled to great weight, see, *e. g., Johnson* v. *Robison,* 415 U. S., at 367–368; *Udall* v. *Tallman,* 380 U. S. 1, 16 (1965). And in this instance, the contemporary Social Security Board was intimately involved in the formulation of the 1939 amendments,[7] and thus must be presumed to have had insight into the legislative intent.[8]

---

42 U. S. C. §§ 402 (e) (1) (C) (ii) and (f) (1) (C) (1970 ed., Supp. III); § 402 (g) (1) (D). Finally, even if an application has been filed and a decision made upon it, the applicant might try to file a suit seeking not review of the administrative record but a *de novo* determination of eligibility. This would raise the question whether the second sentence of § 405 (g) should be read only to prescribe the *way* in which the administrative record "shall be reviewed"; the third sentence makes clear, however, that no action *except* review of the administrative record is available for suits claiming eligibility *under* the statute.

[7] See Report of the Social Security Board, Proposed Changes in the Social Security Act, H. R. Doc. No. 110, 76th Cong., 1st Sess. (1939); Hearings on Social Security before the House Committee on Ways and Means, 76th Cong., 1st Sess., vols. 1, 3, pp. 45–69, 2163–2433 (1939) (testimony of Dr. Altmeyer, Chairman of the Social Security Board).

[8] Other indices of legislative intent and administrative interpretation, although sparse, also suggest that §§ 405 (g) and (h) were intended and interpreted as nothing more than a codification of ordinary administrative exhaustion requirements, applicable to cases presenting questions of fact and of interpretation of the statute. The 1939 Report of the Social Security Board, see n. 7, *supra,* suggested that the amendments include a "[p]rovision that findings of fact and decisions of the Board in the allowance of claims shall be final and conclusive. Such a provision would follow the precedent of the World War Veterans' Act and of other legislation with respect to agencies similar to the Board which handle a large number of small claims." *Id.,* at 13. At the hearings on the amendments, Dr. Altmeyer explained this recommendation as "follow[ing] the

Indeed, to adopt the Court's view of the last sentence of § 405 (h) is, as far as I can determine, to assume that it was inserted precisely to cover the situation here—a suit attacking the constitutionality of a section of Title II and seeking to establish eligibility *despite* the provisions of the statute. Yet, the Court is able to point to no evidence at all that Congress was concerned with this kind of lawsuit when it formulated these sections, and I have not been able to find any either.

Without any clear evidence, indeed without any

precedent laid down in . . . other acts, *where there is a volume of small claims, and where a review of the findings of fact would lead to . . . duplicate administration of the law."* Hearings, n. 7, *supra,* vol. 3, p. 2288. (Emphasis added.) Thus, at their inception the exhaustion provisions which became §§ 405 (g) and (h) were clearly intended to apply only to run-of-the-mill claims under the statutory provisions, in which factual determinations would be paramount.

The House of Representatives Report says of § 405 (g): "The provisions of this subsection are similar to those made for the review of decisions of many administrative bodies." H. R. Rep. No. 728, 76th Cong., 1st Sess., 43 (1939). The Report describes § 405 (h) basically in its own words. *Id.,* at 43–44. There is no indication that the latter section was intended in any way to alter the intent indicated by the quoted sentence—to legislate only ordinary administrative exhaustion requirements.

Finally, a statement inserted by Mr. Mitchell, Commissioner of Social Security, into the record of the 1959 Hearings on the Administration of the Social Security Disability Insurance Program before the Subcommittee on the Administration of the Social Security Laws of the House Committee on Ways and Means, 86th Cong., 1st Sess., 977 (1960), again reflects the view that §§ 405 (g) and (h) together merely reiterate, even if a bit redundantly, that "the jurisdiction of a court to review a determination of the Secretary is limited to a review of the record made before the Secretary. This is made amply clear by the second and third sentences of § [405 (g)] and by the provisions of [§ 405 (h)]. . . . The court has no power to hold a hearing and determine the merits of the claim because the statute makes it clear that the determination of claims is solely a function of the Secretary."

evidence, the Court should not attribute to Congress an intention to filter through § 405 (g) this sort of constitutional attack. "Adjudication of the constitutionality of congressional enactments has generally been thought beyond the jurisdiction of administrative agencies." *Oestereich* v. *Selective Service Bd.,* 393 U. S. 233, 242 (1968) (Harlan, J., concurring in result); *Johnson* v. *Robison,* 415 U. S., at 368.[9]    See 3 K. Davis, Administrative Law Treatise § 20.04 (1958). Thus, in a case such as this one, in which no facts are in dispute and no other sections of the Act are possibly applicable, "the only question of exhaustion was whether to require exhaustion of nonexistent administrative remedies." *Id.,* at 78.  See *Aircraft & Diesel Equipment Corp.* v. *Hirsch,* 331 U. S. 752, 773 (1947). To assume, with no basis in the legislative history or in the clear words of the statute, that Congress intended to require exhaustion in this kind of case, is to impute to Congress a requirement of futile exhaustion, in which the only issues in the case are not discussed, in which the actual issues are in no way clarified, in which no factual findings are made, and in which there is no agency expertise to apply.  I see no basis for imputing such an odd intent, especially since, as discussed below, I believe the clear import of the wording of the statute is to the contrary.

---

[9] At least twice, claimants who attempted to exhaust pursuant to § 405 (g) on a constitutional attack on Title II have been met with an administrative holding that constitutional claims are beyond the competence of the administrative agency.  See *In re Ephram Nestor,* Referee's Decision, Jan. 31, 1958, at Tr. 9, *Flemming* v. *Nestor,* O. T. 1959, No. 54; *In re Lillian Daniels,* Administrative Law Judge's Decision, Nov. 14, 1973, cited in Appellees' Motion to Affirm and/or Dismiss 21 n. 34.  This administrative determination of the agency's jurisdiction is due great deference.  *Johnson* v. *Robison,* 415 U. S. 361, 367–368 (1974).

## B

I think it quite clear that a claim "arising under" Title II is one which alleges that the Title grants someone certain rights. This claim does not "arise under" the Title because, if the statute itself were applied, Mrs. Salfi would certainly lose. Instead, this case "arises under" the Constitution and seeks to hold invalid the result which would be reached under the statute itself. *Johnson* v. *Robison, supra,* as well as cases construing the meaning of "arising under" in other jurisdictional statutes,[10] dictate this result.

In *Johnson,* construing the language which appears *ante,* at 761, we said, 415 U. S., at 367:

"The prohibitions would appear to be aimed at review only of those decisions of law or fact that arise in the *administration* by the Veterans' Administration of a *statute* providing benefits for veterans. A decision of law or fact 'under' a statute is made by the Administrator in the interpretation or application of a particular provision of the statute to a particular set of facts. ... Thus, ... '[t]he questions of law presented in these proceedings arise under the Constitution, not under the statute whose validity is challenged.'" (Citation omitted.)

The Court, *ante,* at 761–762, suggests that this interpretation turned on the precise wording of the statute construed in *Johnson,* specifically on the words "decisions . . . on any question of law and fact." First, as the quotation above shows, *Johnson* in fact concentrated not upon what constitutes a "decision" of the admin-

---

[10] The last sentence of § 405 (h), upon which the Court relies so heavily, refers expressly to old § 41 of Title 28, now 28 U. S. C. § 1331 *et seq.* Thus, it is appropriate to assume that "arising under" is used in § 405 (h) in the same sense as it is used in the general jurisdictional statutes.

istrator but upon what is a decision "under" a statute. But more significantly, the statute construed in *Johnson* had, between 1957 and 1970, read in part:

> "[D]ecisions of the Administrator on any question of law or fact *concerning a claim for benefits or payments* under any law administered by the Veterans' Administration shall be final and conclusive . . . ." 38 U. S. C. § 211 (a) (1964 ed., Supp. V) (emphasis added).

See *Johnson,* 415 U. S., at 368–369, n. 9. The italicized language is obviously quite similar to that used in § 405 (h). The Court's opinion in *Johnson* made clear that the holding that the section does not apply to constitutional attacks on veterans' benefits legislation encompasses all prior versions of the section, and that the "claim for benefits" language in no way affected this construction of the statute.[11]

Aside from *Johnson,* our cases concerning the meaning of "arising under" in the jurisdictional statutes affirm that this claim arises under the Constitution and *not* under the Social Security Act. We have consistently held that a controversy regarding title to land does not "arise under" federal law "merely because one of the parties to it has derived his title under an act of Congress." *Shulthis* v. *McDougal,* 225 U. S. 561, 570 (1912). See *Oneida Indian Nation* v. *County of Oneida,*

---

[11] *Johnson* discusses at length the reasons why the "concerning a claim for benefits or payments" language was eliminated. 415 U. S., at 371–373. These reasons had nothing to do with the problem of constitutional attacks presented in *Johnson* and presented here. The Court concluded: "Nothing whatever in the legislative history of the 1970 amendment, or *predecessor no-review clauses,* suggests any congressional intent to preclude judicial cognizance of constitutional challenges to veterans' benefits legislation." *Id.,* at 373. (Emphasis added.)

414 U. S. 661, 676, and n. 11 (1974). Rather, "a suit to enforce a right which takes its origin in the laws of the United States is not necessarily one arising under the . . . laws of the United States." *Shoshone Mining Co.* v. *Rutter,* 177 U. S. 505, 507 (1900); *Oneida Indian Nation, supra,* at 683 (REHNQUIST, J., concurring). Unless the dispute requires, for its resolution, a decision concerning federal law, the case does not arise under federal law even if, but for a federal statute, there would be no right at all. *Shulthis* v. *McDougal, supra,* at 569; *Oneida Indian Nation, supra,* at 677.

Thus, "arising under" is a term of art in jurisdictional statutes referring, at least in part, to the body of law necessary to consider in order to determine the rights in question. Here, there is no dispute about the application of the Social Security Act; the only controversy concerns whether the Constitution permits the result which the Social Security Act would require. Therefore, this case does not concern a "claim arising under" Title II, and is not precluded by the last sentence of § 405 (h) from consideration under 28 U. S. C. § 1331.

## C

Not only does this case not concern a "claim arising under" Title II, but it is, at least in part, not an "action . . . to *recover* on any claim." (Emphasis added.) A three-judge District Court dealt with the "recover on [a] claim" aspect of § 405 (h) in *Gainville* v. *Richardson,* 319 F. Supp. 16, 18 (Mass. 1970).[12] Judge Wyzanski wrote concerning the effect of the last sentence of § 405 (h):

"In the present action, while plaintiff does, per-

---

[12] This Court, 409 U. S. 1069 (1972), summarily affirmed *Griffin* v. *Richardson,* 346 F. Supp. 1226, 1230 (Md.), which expressed basically the same view, albeit somewhat less clearly.

haps improperly, seek damages, his complaint also has prayers for a declaratory judgment that § 203 (f)(3) of the Social Security Act, 42 U. S. C. § 403 (f)(3) is unconstitutional, and for an injunction restraining defendant from applying that section. If he were to be successful with respect to those prayers, plaintiff would not, in the language of the statute, 'recover on any claim' for benefits. For recovery of benefits he would still need to resort to the administrative process. The only effect of a declaratory judgment or injunction by this court would be to preclude the Secretary from making the challenged deduction." 319 F. Supp., at 18.

This holding seems eminently sensible to me. The legislative history and administrative interpretation of § 405 (h), *supra,* at 790–792, and n. 8, reveal no basis for supposing that the section was to apply to suits which did not request immediate payment of a claim as part of the relief. To construe the statute to cover all actions which may later, *after* administrative consideration, result in eligibility under Title II is to mutilate the statutory language.

The holding in *Gainville, supra,* applies squarely to this case. The complaint sought declaratory and injunctive relief with respect to both the named plaintiffs and the class, as well as retroactive benefits. App. 12–13. The injunction sought was *either* an order to provide benefits *or* "an opportunity for a hearing on the genuineness of their status, [for] plaintiffs and all those similarly situated." *Id.,* at 13. Thus, even if § 405 (h) precludes granting retroactive benefits except under § 405 (g), it would not, under the rationale of *Gainville, supra,* preclude granting any declaratory and injunctive relief to the class, since the relief requested would not necessarily be tantamount to recovery on a claim. Indeed,

the appellants seem to have conceded as much in this case, since it argued here that §§ 405 (g) and (h) were preclusive *only* with regard to retroactive benefits, see n. 1, *supra*.

The Court concludes that there was jurisdiction over the claim for retroactive benefits for the named plaintiffs under § 405 (g). (But see Part D, *infra*.) Under the *Gainville* rationale, there would be jurisdiction under § 1331 over the claims for class declaratory and injunctive relief. And if there was jurisdiction under one jurisdictional statute or another for each part of the action, surely there was jurisdiction over the whole.[13]

## D

Finally, even if I could agree, and I do not, that § 405 (g) is the exclusive route for consideration of this kind of case, I would dissent from the Court's treatment of the exhaustion requirement of § 405 (g), *ante,* at 764–767.

---

[13] Although this case was argued here as if the District Court granted retroactive benefits to the class, I am not sure this is so. The injunction issued ordered the Secretary "to provide benefits, from the time of original entitlement, to plaintiffs and the class they represent, *provided said plaintiffs and class are otherwise fully eligible to receive said benefits.*" 373 F. Supp. 961, 966 (ND Cal. 1974). (Emphasis added.)

As the Court points out, *ante,* at 759 n. 6, in most instances, see n. 6, *supra,* a person is not "eligible" for benefits until he files an application. Further, the order obviously contemplates administrative proceedings in order to determine whether "such persons are otherwise fully eligible." Finally, if exhaustion of § 405 (g) is indeed, as the Court holds, always a prerequisite to eligibility, then a person would not be "otherwise fully eligible" unless and until he exhausts § 405 (g). Thus, I believe that the order can be read not to mandate retroactive benefits but only to require that claims of the class members be treated as if the nine-month marriage requirement did not exist. Such an order does not constitute recovery on a claim and, in my view, was proper under 28 U. S. C. § 1331.

The Court admits, *ante,* at 765, that the purposes of administrative exhaustion "have been served once the Secretary has satisfied himself that the only issue is the constitutionality of a statutory requirement, a matter which is beyond his jurisdiction to determine, and that the claim is neither otherwise invalid nor cognizable under a different section of the Act." Nonetheless, the Court construes the statute so as to permit "the *Secretary* [to] specify such requirements for exhaustion as *he deems* serve *his own* interests in effective and efficient administration. . . . [A] court may not substitute its conclusion as to futility for the contrary conclusion of the Secretary." *Ante,* at 766. (Emphasis supplied.)

If, as the Court holds, the finality and hearing requirements of § 405 (g) are not jurisdictional,[14] *ibid.,* then I fail to see why it is left to the Secretary to determine when the point of futility is reached, a power to be exercised, apparently, with regard only to the Secretary's needs and without taking account of the claimants' interest in not exhausting futile remedies,[15] and in ob-

---

[14] The Court has to ignore plain language of the statute in order to avoid the absurd result of requiring full exhaustion on *all* claims such as this one, even after the point of futility is reached. The statute says that judicial review can be had only "after a hearing," § 405 (g), and it is apparent that the hearing contemplated is a full, evidentiary hearing, see § 405 (b). Rather than avoiding the statutory language by holding that the Secretary can nonetheless dispense with a hearing, the Court would do better to recognize that the patent inapplicability of the statutory language to this kind of case suggests that the statute was never intended to apply at all to constitutional attacks beyond the Secretary's competence.

[15] Indeed, in some cases similar to this one, administrative exhaustion is functionally impossible. For example, in *Weinberger* v. *Wiesenfeld,* 420 U. S. 636 (1975), the applicant was ineligible for benefits because he was a man, a fact obviously apparent as soon as he appeared at the Social Security office. Not surprisingly, he

taining promptly benefits which have been unconstitutionally denied. Further, the Court leaves the way open for a lawless application of this power, since the Secretary can evidently, once the case is in court, assert or not assert the full exhaustion requirements of § 405 (g), as he pleases.

Moreover, and significantly, it flagrantly distorts the record in this case to say that the Secretary waived the exhaustion requirements of § 405 (g), recognizing their futility. True, the Secretary does not *here* claim a lack of jurisdiction for failure to exhaust on the individual claim, see n. 1, *supra*. But he did, in the District Court, move to dismiss the entire action for lack of subject-matter jurisdiction. See Notice and Motion to Dismiss or for Summary Judgment, at Record 114–117. The Secretary said, referring to §§ 405 (g) and (h):

> "From the above provisions, it is clear that the only civil action permitted to an individual on any claim arising under Title II of the Act is an action to review the 'final decision of the Secretary made after a hearing . . . .' The complaint, however, does not allege jurisdiction under section [405 (g)] . . . . Moreover, *there has been no 'final decision' by the Secretary on the matters herein com-*

was refused an opportunity even to file an application for benefits. *Id.*, at 640 n. 6. This case is slightly different, since Mrs. Salfi was precluded not by the obvious fact of her sex, but by a fact which presumably did not appear until she filled out the application—that she had not been married long enough. Yet, the Court suggests that we had jurisdiction in *Wiesenfeld* only because of a stipulation that exhaustion would have been futile. *Ante*, at 767 n. 10. Does this intimate that the Secretary could have refused to waive exhaustion and thereby have eliminated § 405 (g) jurisdiction, even though Wiesenfeld could not possibly have complied with the statute without wrestling an application from the clerk and somehow forcing him to file it?

*plained of . . . and plaintiffs have not exhausted their administrative remedies.* The exhaustion of any available administrative remedies is a *condition precedent* to the plaintiffs [*sic*] bringing this action against the defendants, and the issue is one of subject matter jurisdiction." Defendants' Memorandum in Opposition to the Plaintiffs' Motion for Preliminary Injunction, at Record 65. (First emphasis added.)

In the face of this statement, the Court's conclusion that the Secretary determined "that for the purposes of this litigation the reconsideration determination is 'final,'" *ante,* at 767, is patently indefensible.

## II

The merits of this case can be dealt with very briefly. For it is, I believe, apparent on the face of the Court's opinion that today's holding is flatly contrary to several recent decisions, specifically *Vlandis* v. *Kline,* 412 U. S. 441 (1973); *U. S. Dept. of Agriculture* v. *Murry,* 413 U. S. 508 (1973); and *Jimenez* v. *Weinberger,* 417 U. S. 628 (1974).

In *Vlandis,* we said, 412 U. S., at 446: "[P]ermanent irrebuttable presumptions have long been disfavored under the Due Process [Clause] of the . . . Fourteenth [Amendment]." The Court today distinguishes *Stanley* v. *Illinois,* 405 U. S. 645 (1972), and *Cleveland Board of Education* v. *LaFleur,* 414 U. S. 632 (1974), two cases which struck down conclusive presumptions, because both dealt with protected rights, while this case deals with "a noncontractual claim to receive funds from the public treasury [which] enjoys no constitutionally protected status." *Ante,* at 772. But *Vlandis* also dealt with a Government benefit program—the provision of an

education at public expense. Since the Court cannot dispose of *Vlandis* as it does *Stanley* and *LaFleur,* it attempts to wish away *Vlandis* by noting that "where Connecticut purported to be concerned with residency, it might not at the same time deny to one seeking to meet its test of residency the opportunity to show factors clearly bearing on that issue." *Ante,* at 771.

Yet, the Connecticut statute in *Vlandis* did not set "residency," undefined, as the criteria of eligibility; it *defined* residency in certain ways. The definitions of "resident" were precisely parallel to the statute here, which defines "widow" and "child" in part by the number of months of marriage, 42 U. S. C. §§ 416 (c) and (e) (1970 ed. and Supp. III).

Similarly, *Murry, supra,* and *Jimenez, supra,* both dealt with conclusive presumptions contained in statutes setting out criteria for eligibility for Government benefits. The Court distinguishes them as cases in which the "criteria . . . bear no rational relation to a legitimate legislative goal." *Ante,* at 772. But if the presumptions in *Murry* and *Jimenez* were irrational, the presumption in this case is even more irrational. We have been presented with no evidence at all that the problem of collusive marriages is one which exists at all. Indeed, the very fact that Congress has continually moved back the amount of time required to avoid the irrebuttable presumption, *ante,* at 778–780, suggests that it found, for each time period set, that it was depriving deserving people of benefits without alleviating any real problem of collusion. There is no reason to believe that the nine-month period is any more likely to discard a high proportion of collusive marriages than the five-year, three-year, or one-year periods employed earlier.

The Court says: "The administrative difficulties of individual eligibility determinations are without doubt

matters which Congress may consider when determining whether to rely on rules which sweep more broadly than the evils with which they seek to deal." *Ante,* at 784. But, as we said in *Stanley* v. *Illinois, supra:*

"[T]he Constitution recognizes higher values than speed and efficiency. Indeed, one might fairly say of the Bill of Rights in general, and the Due Process Clause in particular, that they were designed to protect the fragile values of a vulnerable citizenry from the overbearing concern for efficiency and efficacy that may characterize praiseworthy government officials no less, and perhaps more, than mediocre ones." 405 U. S., at 656.

This is not to say, nor has the Court ever held, that *all* statutory provisions based on assumptions about underlying facts are *per se* unconstitutional unless individual hearings are provided. But in this case, as in the others in which we have stricken down conclusive presumptions, it *is* possible to specify those factors which, if proved in a hearing, would disprove a rebuttable presumption. See, *e. g., Vlandis,* 412 U. S., at 452. For example, persuasive evidence of good health at the time of marriage would be sufficient, I should think, to disprove that the marriage was collusive. Also, in this case, as in *Stanley,* 405 U. S., at 655, and *La-Fleur,* 414 U. S., at 643, the presumption, insofar as it precludes people as to whom the presumed fact is untrue from so proving, runs counter to the general legislative policy—here, providing true widows and children with survivors' benefits. And finally, the presumption here, like that in *Vlandis, Murry,* and *Jimenez,* involves a measure of social opprobrium; the assumption is that the individual has purposely undertaken to evade legitimate requirements. When these factors are present, I believe

that the Government's interests in efficiency must be surrendered to the individual's interest in proving that the facts presumed are not true as to him.

I would affirm the judgment of the District Court.