PAGO PETROLEUM PRODUCTS, Inc., Appellant

v.

AMERICAN SAMOA POWER AUTHORITY, Appellee

SOUTH PACIFIC RESOURCES, Inc., and
DOES I through V, Real Parties in Interest

High Court of American Samoa
Appellate Division

AP No. 38-88

March 2, 1989

Before KRUSE, Chief Justice, REES, Associate Justice, and AFUOLA, Associate Judge.

Counsel: For Appellant, John Ward
For Appellee, Martin R. Yerick, Assistant Attorney General
For Real Party in Interest, Roy J.D. Hall, Jr.

This is an appeal from the administrative decision of the American Samoa Power Authority (hereinafter ASPA) concerning a purchase of diesel fuel.

Appellant Pago Petroleum Products, Inc. (hereinafter PPP) maintains that it was the low bidder in a competitive bidding process and should have been awarded the contract. Real Party in Interest South Pacific Resources, Inc. (hereinafter SPRI) maintains that it and not PPP was the low bidder.

Appellee ASPA initially awarded the contract to SPRI, then rescinded the award and issued a new invitation for bids. In its response to this appeal ASPA seeks a declaratory judgment that the contract should be awarded in accordance with the outcome of the rebidding process. Both PPP and SPRI maintain that the proposed rebid would violate the statutory and contractual rights of the winner of the first bidding process.

I. The Bidding Process

On or about November 4, 1988, ASPA published an invitation for bids for diesel fuel to be supplied during the first six months of 1989. Four sealed bids were received, including those of PPP and SPRI.

78

The bids were opened on December 5, 1988. Representatives from PPP and SPRI were present.

The first bid opened was that of PPP, which was for 48.12 cents per gallon "plus applicable American Samoa Government Terminal Fees." When this bid was opened it was passed to the SPRI representative, who looked at it, turned to the PPP representative, and said, "You are giving it away," or words to this effect.

The SPRI bid was opened next. It was for 48.8 cents per gallon and made no reference to a terminal fee. After the bid had been opened and while it was being examined by the PPP representative, the SPRI representative said, "SPRI's price includes the terminal fee."

The terminal fee is one cent per gallon. Since SPRI's bid was less that one cent per gallon higher than PPP's bid, SPRI was the low bidder if and only if its bid should have been construed to include the terminal fee. If not, PPP was the low bidder. (The other two bids were substantially higher.)

On December 6, the day after the bids had been opened, the General Manager of SPRI sent a telephone facsimile message stating:

> In response to ASPA's request for bid clarification, SPRI's price offer includes terminal fee of USD $0.01 per U.S. gallon and any other applicable taxes. (Emphasis in the original.)

On December 12 ASPA awarded the contract to SPRI.

On December 15 PPP protested the award in a letter to ASPA, arguing that SPRI's bid should have been construed not to include the terminal fee and that PPP was therefore the low bidder.

On December 21 the Chairman of the Board of Directors of ASPA convened a meeting at which only one other director was present. These two were the only directors physically present in Samoa and not disqualified by conflict of interest from participating in a decision on the PPP complaint. In a memorandum to the executive director of ASPA

they announced their "conclusion on behalf of ASPA's board of directors" that the original award should be cancelled because of ambiguities in the invitation and a new invitation issued.

On December 22 the executive director issued a second invitation for bids.

Later on December 22 this appeal was filed.

## II.  The Terminal Fee

The one-cent terminal fee has been imposed by law since December 30, 1987, on all petroleum drawn out of American Samoa Government petroleum storage facilities. A.S.C.A. § 20.1607(b)(3), as amended by Public Law 20-43.  (For some months prior to the enactment of Public Law 20-43, a terminal fee had been collected by Executive Order.)

The bidding process that is the subject of the present appeal is the third such process for ASPA fuel contracts during the time the terminal fee has been collected.  In each of the two prior contracts the successful bidder did not include the terminal fee in its per-gallon bid price, but did charge ASPA for the terminal fee in addition to the bid price.  As it happens, one of these two suppliers was PPP and the other was SPRI.

The ASPA fuel contract for the first six months of 1988 was awarded to PPP as a result of a competitive bidding process in December 1987.  The PPP bid had specified a price of 60.47 per gallon "plus applicable American Samoa Government Terminal Fees."  PPP did in fact charge ASPA for the terminal fee in addition to the specified per-gallon price.  (SPRI had been an unsuccessful bidder.  The SPRI bid was for 67.33 cents per gallon and did not mention terminal fees.)

The ASPA fuel contract for the second half of 1988 was awarded to SPRI.  The SPRI bid for this contract had specified a price of 59.0 cents per gallon.  The bid made no mention of the terminal fee.  SPRI has, however, charged ASPA the one-cent terminal fee in addition to the specified contract price throughout the duration of its contract. (PPP, an unsuccessful bidder in this process, had specified a price of 59.34 cents per gallon plus the terminal fee.)

In other words, during the time between the enactment of the terminal fee and the opening of the bids that led to the present appeal, both PPP and SPRI consistently took the position that they would charge ASPA the terminal fee in addition to the contract price for fuel. PPP consistently made this an explicit term of its proposals to ASPA; SPRI gave no such advance notice of the additional fee, but did charge and collect it.

## III. Exhaustion of Administrative Remedies

SPRI initially maintained that the Court lacked jurisdiction over this appeal because PPP had failed to exhaust its administrative remedies. SPRI has since requested affirmative relief from the Court, thus implicitly waiving objection to the Court's jurisdiction. ASPA has explicitly consented to the Court's jurisdiction.

It is not invariably the case that parties to a lawsuit can supply a court with jurisdiction denied to it by the constitutional and statutory provisions that comprise its charter. A party can generally waive the benefit of a limitation on jurisdiction that is clearly designed only for his own protection, such as a rule requiring personal service on defendants. But when the limits of jurisdiction reflect a fundamental decision that certain kinds of questions should be resolved in another court or in some non-judicial forum --- as when the court lacks subject matter jurisdiction over an entire class of cases --- the court is bound by this allocation of decision making power even when the parties to a particular case would willingly submit to a different one.

The requirement that a claimant against a government agency must exhaust his administrative remedies within the agency before bringing suit has been held to comprise both waiveable and non-waiveable elements. Laws prescribing detailed procedures for presenting claims to an agency are generally designed to give the agency a fair chance to review and respond to the claim before being haled into court. See Matthews v. Eldridge, 424 U.S. 319 (1976); Weinberger v. Salfi, 422 U.S. 749

(1975).[1] In a particular case the agency may decide that these purposes have been served notwithstanding the claimant's failure to adhere precisely to all the specified procedures; it may therefore waive its right to object and the court may proceed to hear the case.[2] Neither the agency nor the court, however, may dispense with requirements designed to ensure that the case admits of judicial resolution: that there be a genuine dispute between the claimant and the agency on at least one specific and identifiable question of law or fact. One such requirement is that the agency's decision be final before the claimant challenges it in court. See Matthews, 424 U.S. at 328; Salfi, 422 U.S. at 765-67.

The territorial Administrative Procedures Act, A.S.C.A. §§ 4.1001 et seq. (hereinafter cited as A.P.A.), codifies the doctrine of exhaustion of administrative remedies in many of its particulars. Most of these particulars, such as the aggrieved party's right to an administrative hearing and the rule that the agency must make written findings of fact and conclusions of law, are provided for the protection or convenience of the agency or the aggrieved party. See, e.g., A.S.C.A. §§ 4.1026,

---

[1] Exhaustion is generally required as a matter of preventing premature interference with agency processes, so that the agency may function efficiently and so that it may have an opportunity to correct its own errors, to afford the parties and the courts the benefit of its experience and expertise, and to compile a record which is adequate for judicial review.

Weinberger v. Salfi, 422 U.S. at 765.

[2] [T]he Secretary may waive the exhaustion requirement if he satisfies himself, at any stage of the administrative process, that no further review is warranted either because the internal needs of the agency are fulfilled or because the relief that is sought is beyond his power to confer.

Matthews v. Eldridge, 424 U.S. at 330. See also Weinberger v. Salfi, 422 U.S. at 765-67.

4.1030. As such they are waiveable and have been waived by the parties' submission to the jurisdiction of this Court.

The A.P.A. also provides, however, that judicial review is available only to "[a] person who has exhausted all administrative remedies available within an agency and who is aggrieved by a final decision in a contested case." A.S.C.A. § 4.1040(a).[3] Insofar as this section merely gives the agency the right to insist that all its internal review procedures be exhausted prior to judicial review, it is waiveable and has been expressly waived by ASPA in the present case. But insofar as the "final decision" requirement incorporates the fundamental rule that courts should be in the business of deciding real controversies rather than giving advice about theoretical ones, we must be concerned with it even if the parties are not.

We conclude, however, that ASPA did finally dispose of PPP's claim. The substance of this claim is that by being the low bidder on December 5, 1988, PPP acquired the contractual right to sell ASPA such diesel fuel as it would need between January and June of 1989 at a price of 48.12 cents per gallon plus the terminal fee. ASPA's decision to issue a new invitation for bids, although raising the theoretical possibility that PPP might reoffer its original bid and win the second competition, entails first and foremost a renunciation of the proposition that ASPA incurred any contractual obligations as a result of the first competition.

The decision to rebid the contract came six days after PPP had filed a written protest of the

---

[3] But see also A.S.C.A. § 4.1040(c):

> A preliminary, procedural or intermediate agency action or ruling shall be immediately reviewable only if review of the final agency decision would not provide an adequate remedy.

Since we conclude that the ASPA decision was final, we need not address the application of this subsection to the present case.

initial award to SPRI. The stated justification for the rebid is that the initial invitation for bids contained three ambiguities, two of which have to do with whether a terminal fee will be added to the per-gallon bid price. In context it is clear that the rebid decision was a response by the governing authority of ASPA to PPP's claim that it should have been awarded the contract.

SPRI points out that there was no quorum of the Board of Directors at the December 21 meeting. The quorum for meetings of the ASPA Board of Directors is three of the five directors. A.S.C.A. § 15.0103(c). At the time there were only four directors of ASPA, the fifth position being vacant. Two members were present at the December 21 meeting: Chairman Smith S. Lutu, and Director and Legal Counsel Enere Levi. One of the two remaining directors, who manages a company that had bid for the fuel supply contract, disqualified himself from participating in the decision because of this conflict of interest. The fourth director resides in Hawaii and the record does not reflect the extent, if any, to which he participated in the decision.

ASPA does not assert that there was a quorum, but contends that the rebid decision did not require a formal meeting of the Board of Directors. ASPA contends that immediate action to resolve the uncertainty over who was entitled to the fuel supply contract was urgently necessary since ASPA would otherwise run out of fuel within about two weeks, leaving the Territory without electricity, fresh water, or a waste water disposal system. Under these circumstances ASPA maintains that a decision taken by two-thirds of the eligible directors, although not at a formal meeting, should be regarded as a decision of the Board; or that the executive director of ASPA, who is its chief operating officer and is vested by A.S.C.A. § 15.0104 with "all executive functions," had authority to act on the recommendation of the Chairman and Legal Counsel of the Board.

It does not seem unreasonable to attribute to ASPA, acting through those of its directors who can be assembled for an emergency meeting or even through its chief executive officer acting alone, the power to respond conclusively to administrative complaints in cases whose circumstances do not admit of delay. At this stage of our analysis,

84

however, we are concerned not with whether the rebid decision was lawful but only with whether it should be regarded as the agency's final decision. It is important to notice that these are different questions: a decision may be substantively illegal and yet be the real and settled position of the agency.

Moreover, the rebid decision may be "final," for the limited purpose of determining whether it gave rise to a justiciable controversy, even if the process by which it was made was defective in ways that would have entitled ASPA or another party to insist that it be reconsidered at a proper meeting of the Board prior to any judicial review. Since all parties to this case have implicitly or explicitly consented to the jurisdiction of the Court, any procedural defects that are waiveable by the parties must be regarded as waived. <u>See</u> <u>Weinberger v. Salfi</u>, <u>supra</u>; <u>Matthews v. Eldridge</u>, <u>supra</u>. The only non-waiveable defects are those that would render the decision tentative or interlocutory rather than final. A decision is final in this sense, even though it might theoretically have come out differently if the agency or an aggrieved party had insisted on the full panoply of available administrative procedures, provided that it is meant to reflect the settled position of the agency and that it leaves the parties genuinely adverse.[4]

---

[4] Cf. <u>Weinberger v. Salfi</u>, 422 U.S. at 767:

> Much the same may be said for the statutory requirement that the Secretary's decision must be made "after a hearing." . . . [A] hearing [would] be futile and wasteful, once the Secretary has determined that the only issue . . . is a matter of constitutional law concededly beyond his competence to decide . . . .
>
> In the present case the Secretary does not raise any challenge to the sufficiency of the allegations of exhaustion in appellees' complaint. We interpret this to be a determination by him that for the purposes of this litigation the reconsideration determination is "final."

These conditions are met in the present case. After PPP filed its administrative complaint, two of the three directors who were eligible to participate in the proceeding met and formulated what they clearly intended to be ASPA's final response to that complaint. No party to the appeal has suggested that the agency's position would be any different if the three eligible directors were required to assemble in the same room to reconsider their decision. The chief executive officer of the agency lent his own authority to the decision by implementing it. Before this appeal was filed the agency had already translated its response into action by cancelling the original award and issuing the invitation for new bids. Finally, in its conduct of this appeal ASPA has treated the rebid decision as conclusive: although government entities commonly resist challenges to their actions by seeking judicial affirmation of their continued <u>discretion</u> over the matter in controversy, the primary relief sought by ASPA in this case is a judicial <u>order</u> that the new bidding process go forward.

The agency may have responded in the wrong way to the PPP complaint, but the agency has clearly and definitely responded. We therefore decline to contradict the judgment of both ASPA and PPP that the dispute between them is a genuine one that admits of judicial review.

## IV. The Merits of the PPP Complaint

The sole argument urged by PPP on appeal is that the SPRI bid should have been construed to exclude the terminal fee.

ASPA contends, on the other hand, that the original invitation for bids contained two ambiguities with respect to the terminal fee: it did not make clear whether fuel destined for ASPA, a government agency, would be subject to terminal fees; and it did not make clear whether terminal fees charged to the supplier, if any, would be passed on to ASPA in addition to the per-gallon bid price. The decision to issue a new invitation for bids was therefore justified by the administrative rule providing for such action in the event of "[i]nadequate or ambiguous specifications contained in the solicitation." A.S.A.C. § 10.0232.

This contention ignores the possibility that the bids themselves might have eliminated any ambiguity latent in the invitation. Suppose, for instance, that all four bidders had added to their per-gallon bid prices the language used by PPP: "plus applicable American Samoa Government Terminal Fees." Both of the ambiguities would then have been eliminated: ASPA could have ascertained with certainty the identity of the low bidder and the exact price it would have to pay for fuel, the former by a glance at the bids and the latter by a call to the Tax Office about whether the terminal fee would be "applicable" to ASPA fuel.

The SPRI bid did not indicate on its face whether the terminal charge was included or excluded. PPP argues, however, that SPRI had eliminated any ambiguity on this count by its performance under the ASPA fuel contract for the second half of 1988. We agree.

The successful SPRI bid for the 1988 contract, like the SPRI bid for the 1989 contract, gave a per-gallon price without mention of the terminal fee. Indeed, the language of the two documents is identical in every important respect. Yet throughout the duration of the 1988 contract SPRI charged ASPA the terminal fee in addition to the per-gallon price. At the moment the bids for the new contract were opened on December 5, 1988, SPRI was still interpreting the price term on its existing contract to exclude the terminal fee. The first notice to ASPA that SPRI would interpret the identical language in its 1989 bid to include the fee came after the opening of the bids, after the SPRI representative had seen the PPP bid, and after it was clear that SPRI would be the low bidder if and only if it changed its interpretation.

It is a well-established tenet of contract law that ambiguities in the offer and acceptance, which otherwise might prevent the formation of a contract, may be resolved by reference to the prior business relations of the parties. See Restatement (Second) of Contracts §§ 202, 203, 223, and comment (a) to § 33; Corbin on Contracts §§ 95, 556; Uniform Commercial Code § 1-205. The circumstances of this case are unusual, in that the record suggests ASPA's management never realized it was being charged the terminal fee under the 1988 contract. While this distinction might be helpful to ASPA in a suit against SPRI, it does not

extricate SPRI from the consequences of its own former interpretation. A party who unilaterally places a practical construction on contract language does not necessarily bind other parties to this construction, but he seriously limits his own chances of enforcing an opposite construction when the old one should be of no further benefit to him. See Corbin, supra, § 558.

When asked by ASPA to explain the shift in its interpretation, SPRI argued that the fuel supply business in American Samoa had changed between June and December of 1988. The change was laid to a single important event. In a letter to ASPA dated December 16, 1988, the general manager of SPRI stated that

> there was significant confusion during the first six months as to the legality of [the terminal] fee and if it would remain in effect. The legality question . . . was not resolved until July 1988 with legislation being passed by the American Samoa legislature . . . . Under these circumstances no petroleum supplier could include the terminal fee in a bid proposal . . . .

> The above cited questions were resolved with the terminal fee legislation being enacted in July 1988. Therefore, SPRI did include the $0.01 per gallon terminal fee in the bid proposal to supply ASPA during the January-June 1989 time period.

This argument --- that the terminal fee was arguably illegal and its collection uncertain in June, but was legal and therefore certain in December --- was the sole justification advanced by SPRI in response to PPP's administrative claim that the SPRI bid should have been construed consistently with its prior performance. It is, however, clearly wrong. The terminal fee was enacted into law in December 1987, not July 1988. Its continued collection was at least as certain in June 1988 as in December 1988. There were no changed circumstances.

With its brief on this appeal SPRI has filed

an affidavit[5] from its general manager, acknowledging that he was mistaken about the date the terminal fee was enacted but affirming that "the referenced confusion over the continued applicability of the fee to ASPA was nonetheless accurate." His affidavit also states that at some unspecified time between June and December "SPRI switched its bidding practice over to providing an all inclusive price." He asserts that this change was based on a general trend among fuel suppliers toward "inclusive" prices. He attaches two billing statements from SPRI as illustrations. One bill, dated February 1988, offers fuel at "USD .650 plus .035 excise tax plus .01 terminal fee per gallon." The other, dated November 1988, offers "bunkering at USD .565 per gallon delivered."

The manager further attests that he specifically instructed SPRI's local representative to include the terminal fee in its December bid to ASPA. SPRI also files an affidavit from its local representative confirming that the general manager had so instructed him.

This evidence creates for SPRI at least as many problems as it solves. The two billing statements, when construed with the bids submitted by various fuel suppliers to ASPA in December 1987, June 1988, and December 1988, do not even begin to prove the asserted change in local commercial practices during the period in question. On the contrary, only one supplier other than SPRI seems to have made any change in the way it describes its prices, and that supplier was already quoting "inclusive" prices in 1987. With regard to SPRI's pricing policies, the evidence establishes only that (1) as early as February 1988 SPRI knew how to tell a customer whether or not its per-gallon price included the terminal fee; (2) nevertheless, on at least one occasion (in June 1988) SPRI quoted what would appear to the naked eye to be an "inclusive"

---

[5] Although this evidence is not in the record, the A.P.A. authorizes the court in its discretion to receive evidence to supplement the record. A.S.C.A. § 4.1043(a). In light of the expedited process employed by ASPA to resolve the complaint before it, it would be unfair not to exercise our discretion to receive the affidavits and exhibits offered by SPRI into evidence.

price but later charged its customer extra for the terminal fee; (3) on at least one occasion prior to February (in December 1987) SPRI had also quoted what appeared to be an "inclusive" price but would have charged extra for the terminal fee if it had been awarded the contract; (4) in November 1988 SPRI again quoted a customer a per-gallon price without mentioning the terminal fee one way or another, but we have no evidence of whether the customer was in fact charged extra for the terminal fee; and (5) in its December 1988 bid SPRI employed the same language it had used in three prior quotations, in connection with at least two of which it did intend to charge extra for the terminal fee.

The affidavits by the two SPRI officials about their private conversations raise a related question. If SPRI specifically anticipated the question whether the terminal fee would be included, discussed it within the firm, and resolved that the question should be answered in a way that was directly contrary to the clear inference from SPRI's then existing relationship with ASPA, why not say so before the bids were opened? The bidding process is not a multiple choice test in which it is forbidden to explain one's answers. SPRI had access to the previous bids of PPP and other bidders which clearly indicated whether the terminal fee was included or excluded in the per-gallon price. Indeed, SPRI's own description of its price in the December 1988 bid is a complicated one incorporating several terms and conditions; and on at least one occasion (in February 1988) SPRI considered it important to tell a customer whether or not the terminal fee would be included.

Even if SPRI really had changed its pricing policy toward other customers and really did intend to make such a change with regard to ASPA, it knew or should have known that this would not be so obvious as to go without saying. The prior dealings between SPRI and ASPA were an indelible part of the record in any controversy that might arise over the December 1988 bid. Until the bids were opened there was no way to tell what form such a controversy might take --- whether it would be to SPRI's advantage to have bid 48.8 cents including the terminal fee or 48.8 cents plus the terminal fee. By not countermanding the evidentiary effect of its prior dealings by a clear contrary statement

prior to the opening of the bids, therefore, SPRI inevitably did one of two things: either it bound itself to its prior interpretation of the per-gallon price term, or it gave itself a one-cent "point spread" over other bidders. The latter possibility would defeat the central purpose of requiring sealed bids.

We conclude that ASPA's initial construction of the SPRI bid to include the terminal fee was clearly erroneous. The bid should have been construed, consistently with the objective evidence of SPRI's pricing policy toward ASPA as of the day bids were opened, as for 48.8 cents per gallon plus the one-cent terminal fee. This is higher than the PPP bid which was 48.12 cents plus the terminal fee. The two other bids were for 61.0 cents and at least 50.04 cents respectively; even if they are construed as including the terminal fee, they are higher than the PPP bid. PPP was therefore the low bidder.

A call for new bids on the ground of an ambiguity that has already been cured by the bids themselves would not seem to be strictly inconsistent with the language of the administrative rule on which ASPA relies. The rule seems to allow cancellation of bids on account of "[i]nadequate or ambiguous specifications contained in the <u>solicitation</u>" when such cancellation is believed by the procurement officer to be "in the best interest of the government." A.S.A.C. § 10.0232 (emphasis added). Rejection of a bid which is clearly the low one on the ground of an irrelevant ambiguity in the solicitation, however, would violate the statutory law governing competitive bidding. Such a rejection followed by a new invitation for bids would amount to allowing "changes in bid prices or other provisions of bids prejudicial to . . . fair competition" in violation of A.S.C.A. § 12.0211.

ASPA relies not only on the administrative rule regarding ambiguities, but also on a clause reserving "the right to reject all offers." This clause is in a section of the invitation for bids that itemizes specific grounds on which ASPA may reject a particular offer: non-compliance with the terms of the invitation, reason to believe the bidder is not financially responsible, and so forth. In this context, the most obvious reading of the clause now cited by ASPA is that ASPA

91

reserved the right to reject bidders <u>on any of the stated grounds</u> even if this resulted in the elimination of all bidders. In the absence of this or some other limiting construction, the clause would appear to be contrary to the competitive bidding law. An attempted reservation of the right to order a second round of bidding for no reason at all, or just because the government might get a better price if bidders are allowed to rebid after looking at their competitors' bids, would permit changes in bids prejudicial to fair competition. <u>See</u> A.S.C.A. § 12.0211.

We are not suggesting that ASPA had any such ulterior motive in the present case. Nevertheless, since ASPA has advanced no reason for rejecting the PPP bid other than alleged ambiguities in the solicitation, the clause reserving the right to reject all bidders affords no authority for the rejection so long as PPP's bid was unambiguously the low one.

### V. Platt's Oilgram Reports

ASPA's pleading in this appeal alludes to a third ambiguity in the invitation as a further ground for ordering the rebid. This ambiguity has nothing to do with the terminal fee, which was the subject of PPP's appeal of the initial award to SPRI. Nor was it the subject of an administrative complaint by any other bidder.

Indeed, this alleged ambiguity was not in the invitation itself but in certain of the bids. The invitation offered bidders the option of citing "a flat per gallon price with escalators." All four bidders chose to take advantage of this option, and all four referred to an industry standard called Platt's Oilgram Reports. A letter from Mobil Oil Australia Limited submitted with its bid suggests that different parties may mean different things by their references to dates for which Platt's provides price data. The proposed rebid would demand more information from any bidder citing Platt's Oilgram Reports --- although not, it would appear, precisely the information Mobil suggests would be necessary to clear up the ambiguity.

The record with regard to this alleged ambiguity is between sketchy and nonexistent. The reference to it in ASPA's pleading seems unusually opaque even for a reference to industry standards.

Since ASPA did not brief this appeal and the other parties did not allude to this issue in their briefs, we have received no guidance from the parties on whether and how this alleged ambiguity matters.

From the record we do have it appears that PPP is unambiguously the low bidder notwithstanding the failure of various bidders to specify the "reference date[s] for the bid prices" that would be requested by the rebid. PPP and SPRI, despite using different reference dates, came up with an identical figure of 40.5 cents per gallon as the base price from which they calculated their bid prices. Mobil used a range of base prices from 36 to 42 cents per gallon and quoted a corresponding range of bid prices, the lowest of which was higher than either the PPP or the SPRI bid. The fourth bid was so much higher than any of the other three that it would seem uncompetitive no matter how many ambiguities were resolved in its favor.

We note further that both PPP and SPRI have a record of performance on ASPA fuel supply contracts that should afford an objective basis for resolving any residual ambiguity on this point. On the present state of the record we hold that PPP was unambiguously the low bidder notwithstanding any uncertainty over "reference date for the bid price." If we have misread the record or otherwise erred in this conclusion, ASPA and SPRI remain free to urge such error by timely petition for rehearing.

## VI. Conclusion and Order

Since PPP was the low bidder, and since there was no ground on which to reject the low bid, PPP acquired the right to the fuel supply award upon the opening of the bids. The initial award to SPRI was based on a clearly erroneous interpretation of the SPRI bid, and the subsequent decision to reject all bids was contrary to law. A.S.C.A. § 12.0211.

After a preliminary hearing on this appeal, all three parties stipulated that SPRI should continue to supply fuel to ASPA on the terms of its 1988 contract pending the Court's decision on the appeal. The parties further stipulated that in the event PPP should be determined to have won the contract, the period of the award would be "extended to at least a six-month period next

93

following resolution" of this appeal. We therefore order that PPP be awarded at least a six-month fuel supply contract on the terms of its December 1988 bid.

By agreement of the parties and in accordance with Appellate Court Rule 40, the time for filing any petition for rehearing of this appeal is hereby set at seven days. Our judgment and order in this appeal will be stayed pending the disposition of any such petition, and the term for which PPP shall be awarded the contract will begin at the conclusion of this stay or any extension thereof.

It is so ordered.